**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RENEE LOWERY; LISA S. PETERSON,
Plaintiffs-Appellees,

and

SHELBY MCKNIGHT; GREGORY FLEMING;
SONYA HAIRSTON; DYNELLE JOHNSON;
NADRA SMITH; PONNETTE SMITH; SHEILA
SMITH; PATRICIA SPENCER; EDWARD
STOKES,
Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED,
Defendant-Appellant.

CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA; WASHINGTON
LEGAL FOUNDATION; EQUAL
EMPLOYMENT ADVISORY COUNCIL;
NATIONAL RETAIL FEDERATION; EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION;
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.,
Amici Curiae.

SHELBY MCKNIGHT; GREGORY FLEMING;
RENEE LOWERY; NADRA SMITH;
PONNETTE SMITH; SHEILA SMITH;
PATRICIA SPENCER; EDWARD STOKES;

LISA S. PETERSON,
Plaintiffs-Appellants,

and

No. 97-1372

No. 97-1470

SONYA HAIRSTON; DYNELLE JOHNSON,
Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED,
Defendant-Appellee.

CHAMBER OF COMMERCE OF THE UNITED

STATES OF AMERICA; WASHINGTON
LEGAL FOUNDATION; EQUAL
EMPLOYMENT ADVISORY COUNCIL;
NATIONAL RETAIL FEDERATION; EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION;
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.,
Amici Curiae.

SHELBY MCKNIGHT; RENEE LOWERY;
LISA S. PETERSON,
Plaintiffs-Appellees,

and

GREGORY FLEMING; SONYA HAIRSTON;
DYNELLE JOHNSON; NADRA SMITH;
PONNETTE SMITH; SHEILA SMITH;
PATRICIA SPENCER; EDWARD STOKES,

Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED,
Defendant-Appellant.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION; NAACP LEGAL
DEFENSE AND EDUCATION FUND, INC.,
Amici Curiae.

No. 97-1917

2

RENEE LOWERY,
Plaintiff-Appellee,

and

SHELBY MCKNIGHT; GREGORY FLEMING;
SONYA HAIRSTON; DYNELLE JOHNSON;
NADRA SMITH; PONNETTE SMITH; SHEILA

No. 98-1170

SMITH; PATRICIA SPENCER; EDWARD
STOKES; LISA S. PETERSON,
Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-95-964)

Argued: December 1, 1999

Decided: March 14, 2000

Before MURNAGHAN and WILKINS, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded with instructions by
published opinion. Senior Judge Hamilton wrote the opinion, in
which Judge Murnaghan and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Donald Manwell Falk, MAYER, BROWN & PLATT,
Washington, D.C., for Appellant. David Jay Cynamon, SHAW, PITT-

3

MAN, POTTS & TROWBRIDGE, Washington, D.C., for Appellees. Paul D. Ramshaw, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae EEOC. **ON BRIEF:** Andrew L. Frey, Kenneth S. Geller, Peter C. Choharis, Mark S. Davies, MAYER, BROWN & PLATT, Washington, D.C.; W. Stephen Cannon, Pamela G. Parsons, Teri C. Miles, CIRCUIT CITY STORES, INC., Richmond, Virginia, for Appellant. James B. Hamlin, Duane K. Young, Phillip D. Bostwick, Atina S. Harley, SHAW, PITTMAN, POTTS & TROWBRIDGE, Washington, D.C.; Avis Buchanan, Roderick V.O. Boggs, THE WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C.; John A. Gibney, Jr., SHUFORD, RUBIN & GIBNEY, P.C., Richmond, Virginia; Joseph M. Sellers, COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C., Washington, D.C., for Appellees. C. Gregory Stewart, General Counsel Designate, Philip Sklover, Associate General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Vincent J. Blackwood, Assistant General Counsel, Gwendolyn Young Reams, Associate General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae EEOC. Robert J. Smith, Harry A. Rissetto, Mona C. Zeiberg, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Stephen A. Bokat, Robin S. Conrad, Sussan Mahallati Kysela, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C., for Amicus Curiae Chamber of Commerce. Robert E. Williams, Ann Elizabeth Reesman, Todd B. Castleton, MCGUINESS, NORRIS & WILLIAMS, Washington, D.C., for Amicus Curiae Advisory Council. Elaine R. Jones, Director-Counsel, Theodore M. Shaw, Norman J. Chachkin, Charles Stephen Ralston, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., New York, New York, for NAACP Fund.

_____

## OPINION

HAMILTON, Senior Circuit Judge:

In this employment discrimination case, Renee Lowery (Lowery) and Lisa Peterson (Peterson), among others, alleged that Circuit City intentionally refused to promote them on account of their race,

African-American, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.§ 2000e-2(a)(1). The jury found in Lowery and Peterson's favor, awarding Lowery $12,500 in compensatory damages and $225,000 in punitive damages, and awarding Peterson $4,200 in compensatory damages and $47,000 in punitive damages. The district court entered judgments in conformity with the jury's verdict. Circuit City then made a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (Rule 50(b)), which the district court denied. Circuit City noted a timely appeal to this court.[1] On appeal, Circuit City argued, inter alia, that the district court erred in denying its Rule 50(b) motion with respect to Lowery and Peterson's prayer for punitive damages.

On appeal, inter alia, we upheld the compensatory damage awards with respect to both Lowery and Peterson, but vacated the award of punitive damages in favor of each on the ground that the record contained insufficient evidence "to conclude that Circuit City's conduct toward Lowery and Peterson was so egregious that it was appropriate to submit the issue of punitive damages to the jury." Lowery v. Circuit City Stores, Inc. (Lowery I), 158 F.3d 742, 766 (4th Cir. 1998). The Supreme Court subsequently granted the Plaintiffs' petition for writ of certiorari, vacated our judgment, and remanded the case to this court for further consideration in light of Kolstad v. American Dental Ass'n, 119 S. Ct. 2118 (1999). See Lowery v. Circuit City Stores, Inc., 119 S. Ct. 2388 (1999).

In Kolstad, the Court clarified the circumstances under which a jury may consider a request for punitive damages under Title VII. See Kolstad, 119 S. Ct. at 2121. In so doing, the Supreme Court rejected the District of Columbia Circuit's holding that eligibility for punitive damages can only be described in terms of an employer's "`egregious' misconduct." See id. at 2124.

Our chief substantive task on remand is to revisit the issue of whether the district court erred in denying Circuit City's Rule 50(b)

_____

[1] Lowery, Peterson, and the other plaintiffs (collectively the Plaintiffs) noted a timely cross appeal raising various issues decided adversely to them.

motion for judgment as a matter of law with respect to Lowery and Peterson's prayer for punitive damages, but to do so in light of the legal principles annunciated by the Court in <u>Kolstad</u>, 119 S. Ct. at 2118. <u>See Kotler v. American Tobacco Co.</u>, 981 F.2d 7, 13 (1st Cir. 1992) ("The general rule is that, when the Supreme Court remands a civil case, the court of appeals should confine its ensuing inquiry to matters coming within the specified scope of the remand."). On this issue, we hold the district court did not err. Thus, we affirm the judgments in favor of Lowery and Peterson with respect to the jury's awarding of punitive damages.

With one exception, <u>Kolstad</u> and our disposition on remand of the punitive damages issue leave untouched our resolution of the remaining issues in <u>Lowery I</u>. The one exception is the issue of the appropriateness of the district court's general award of attorneys' fees and costs totaling nearly $4 million upon application by the Plaintiffs. Given our disposition on remand in favor of Lowery and Peterson on the punitive damages issue, we slightly modify our instructions to the district court regarding redetermination on remand of its general award of attorneys' fees and costs. For all other issues unrelated to these modified instructions and unrelated to the issue of punitive damages, we reaffirm our holdings and analysis as stated in <u>Lowery I</u> without further discussion.

I

The full panoply of facts involved in and procedural history of this case are set forth in our now vacated opinion. <u>See Lowery I</u>, 158 F.3d at 749-57. Here, we only include the facts relevant to the punitive damages issue set forth in the light most favorable to Lowery and Peterson. <u>See In re Wildwood Litig.</u>, 52 F.3d 499, 502 (4th Cir. 1995).

Circuit City owns and operates a rapidly growing chain of retail consumer electronic stores that by January 1996 employed 37,000 "associates" nationwide. By November 1996, Circuit City employed 3,500 people at its Richmond, Virginia headquarters, about 800 of whom were African-Americans. Several hundred other Circuit City employees work for a wholly-owned subsidiary called First North American National Bank (FNANB), which provides consumer credit to Circuit City's customers.

6

Lowery joined Circuit City in October 1989 as a management recruiter in the Management Recruiting Department in the Human Resources Division. The title "Management Recruiting Department" is a misnomer, because the purpose of the Management Recruiting Department was to recruit employees for non-managerial positions at Circuit City. The title apparently derives from the notion that the department helps managers at Circuit City fill non-managerial positions.

Lowery held both an undergraduate and masters degree in business administration. The manager of the Management Recruiting Department from 1989 until mid-1994, Catharine Madden, consistently gave Lowery high performance reviews. Lowery consistently exceeded her numerical recruiting goals through July 1995, and became Circuit City's most senior and highly paid recruiter. Despite this success, however, Lowery unsuccessfully sought approximately seven promotions in seven years.

In October 1994, Cynthia Turner (Turner) became manager of the Management Recruiting Department, responsible for supervising nine recruiters. Circuit City gave Turner authority to expand the department such that by October 1996, the department had twenty-one recruiter positions. Turner had authority to hire persons to fill budgeted positions in her sole discretion without first consulting her boss, Senior Vice President William Zierden (Zierden), the head of Circuit City's Human Resources Division from 1984 to 1996. [2] Circuit City

_____

[2] Zierden believed that large companies were hampered by bureaucracy, including "rigid systems of job descriptions and rigid [qualifications]" for people to fill job openings. (J.A. 2680). In accordance with this belief, Zierden implemented a company-wide system for promotions that bestowed upon promoters the ability to use widely subjective criteria in their decision-making processes. Specifically, the evidence, when viewed in the light most favorable to Lowery and Peterson, establishes that, at all times relevant to this case, Circuit City: (1) had no written procedures indicating how managers and supervisors should go about promoting employees; (2) had no written procedures or practices requiring a review, either by the Human Resources Department or anyone else, of any promotion decision; (3) did not require promoters to post or advertise job openings, but permitted them to announce an opening to a single

7

also allowed Turner the discretion to organize her department in any way she wanted.

Shortly after Turner became manager of the Management Recruiting Department, she decided to create a new position titled Supervisor of Management Recruiting. Turner interviewed everyone in the department for the new position, including Lowery and Paige Bell (Bell), who, along with Lowery, had expressed interest in the position. Bell is white. Ultimately, Turner offered the new position to Bell, who had less seniority than Lowery, less supervisory experience before joining Circuit City than Lowery, and held neither an undergraduate nor a masters degree in business administration. At trial in this case, Circuit City claimed Bell received the promotion because she was more organized than Lowery.

Peterson joined FNANB in February 1993 as an account management representative. In July 1993, she entered FNANB's training program, which rotates associates through different departments every few months. In May 1994, Peterson rotated into an acting assistant supervisor position in the Customer Service Mail Department. It appears that Peterson again rotated into that department some time later. When a permanent position as Assistant Supervisor became available in the Customer Service Mail Department, Peterson applied for the position. Until this time, Peterson had consistently received high performance evaluations.

Peterson's supervisor, Jodi Bischoff (Bischoff), rejected Peterson for the promotion in favor of Janet Whalen (Whalen), who is white. According to Peterson, Whalen had less experience than she did because Whalen had only one rotation as an FNANB trainee; Whalen never received supervisory experience in the Customer Service Mail Department; and Whalen had no familiarity with the reports and mon-

_____

candidate of the promoter's own choosing without notifying anyone else of the vacancy; and (4) when a job opening was posted, had no requirements about what the posting should contain. Dr. Beatty, an expert in the field of human resources, testified during the trial in this case that the kind of subjective criteria system implemented by Zierden could easily result in discrimination against racial minorities.

8

itoring expected of an Assistant Supervisor in that department. When offered the promotion, Whalen turned it down. Nevertheless, Circuit City did not then offer the promotion to Peterson, but chose another white employee, Denise Ramos, for the position. According to Peterson, Ramos had no prior customer service experience, no knowledge of the operating functions of FNANB, no background contacting customers, and no knowledge of the company's computer system. Witnesses for Circuit City also admitted that, when Ramos was selected for the position, she was struggling in her current assistant supervisory position in another department and could not keep pace with her duties. Peterson left FNANB soon after she was rejected for the promotion.

At trial, Lowery and Peterson demonstrated racial animus on the part of Circuit City by introducing evidence that certain Circuit City executives had made comments evincing racially discriminatory attitudes.[3] First, in 1991, when Lowery approached Austin Ligon, Circuit City's Vice President of Corporate Planning, about a position in his department, he suggested that she "could do better someplace else," at a company that was "more receptive to minorities and women." (J.A. 2091). He mentioned that Lowery should go to a company like Pepsi Cola, which "put [minorities] in decision-making roles," (J.A. 2091). Second, in 1993, Zierden told Lowery that he believed that sales decreased in stores with black managers. Third, Zierden advised Larry Jones, an applicant for a position in Circuit City's Human Resources Division, that "the caliber of minorities and blacks who are in the company, in Circuit City, would not meet the standards for a corporate headquarters type job, and in particular this type [of] job." (J.A. 3145). Fourth, Zierden also told Jones there were "few, if any," blacks in decision-making roles at Circuit City and "he didn't see that situation changing anytime soon because . . . those people who would be maybe [sic] eligible to be promoted upward just weren't there." (J.A. 3148). Fifth, Zierden said that blacks who worked in Circuit City's retail stores "had a propensity to steal." (J.A. 3145-46).

_____

[3] For the purposes of this appeal, the parties treat FNANB as a division of Circuit City rather than a separate legal entity or a separate employer. We do likewise.

9

Lowery and Peterson also demonstrated racial animus on the part of Circuit City by introducing evidence that Zierden "buried" two internal reports, known as the Booth and Cook Reports, that were critical of Circuit City's promotion policies and diversity results. In December 1990, Zierden instructed Karen Booth, an employee in the Human Resources Division, to perform a study of how well Circuit City managed diversity in its workplace. Booth's January 1991 report noted, among other things, that statistics on Circuit City's store employees showed that "[t]he promotion ratio for male and non-minority [sales] counselors are [sic] significantly higher than those for women and minorities." (J.A. 838). Booth concluded that "[i]t is my assumption that many female and minority associates look up the ladder and see no one there like themselves. They perceive no upward mobility beyond a certain level and they look for opportunities outside the company." (J.A. 864, 2641). Zierden directed Booth to retrieve all copies of the report that she had given to other managers, and never discussed the report with any other Circuit City executives.

In May 1995, Circuit City retained Sarah Cook, a graduate student in psychology at the University of Virginia, to conduct a survey and prepare a written report on employee job satisfaction at FNANB. Cook worked on the project for approximately seven months and produced a written report in January 1996. Cook's report noted, inter alia, employee concerns that one had to belong to certain cliques in order to get promoted, and that minorities felt excluded. Comments by survey respondents included: "I hate to express this but race affects promotions" and "Minorities are constantly overlooked for promotions and will continue to be overlooked until someone takes legal action against FNANB." (J.A. 1106). Cook's report concluded that a sizeable number of associates perceived that minority associates are not treated equal when compared to majority associates. Cook had recommended that Circuit City review its company policies and practices, but noted that the company's response was defensive and dismissive.

Circuit City never distributed the Cook report to its employees, but instead circulated a short memorandum purporting to summarize the survey's results. The memorandum said nothing about Cook's findings and recommendations about promotion procedures. Moreover,

10

Circuit City took no action concerning the complaints about promotions and made no changes in its promotion practices.

The record does contain evidence that Circuit City engaged in efforts to comply with federal anti-discrimination laws. For example, Circuit City requires all of its managers to attend a week-long seminar entitled "Managing Through People" that instructs them in appropriate supervision. According to Circuit City, managers are warned not to use impermissible selection criteria in hiring and promotions, and are admonished that Circuit City firmly believes all associates and customers should be treated with respect, Circuit City has policies in place to achieve this goal, and Circuit City is an equal opportunity employer which has set policies and standards to comply with all federal and state laws forbidding discrimination.

The record also contains evidence that Circuit City had a company-wide policy entitled "Treating Associates with Respect," which in part embodied Circuit City's alleged commitment not to discriminate against its employees on account of factors made illegal by federal anti-discrimination statutes such as § 1981 and Title VII. The record contains evidence that Circuit City sent out posters reflecting this policy to its retail stores, included the policy in its 1991 employee handbook, and conducted some individual training sessions regarding the policy with employees in 1991 or 1992.

The record also contains evidence that Circuit City's employee handbook described three avenues for employees to express complaints on all topics and bring problems to the company's attention: the Open Door Policy, the Associate Cool Line, and Coffee Conferences. The Open Door Policy encourages non-management employees to discuss any employment complaints or problems with members of management, beginning with an employee's immediate supervisor, moving to that supervisor's supervisor if the employee did not feel that he or she had yet received a satisfactory response, and ultimately conferring with the President of Circuit City if need be. The Associate Cool Line is a phone line reserved for calls from non-management employees wishing to express concerns regarding problems that cannot be resolved by their immediate supervisor or by others whom they have contacted for help.

11

The Coffee Conferences are annual meetings held by a member of the Human Resources Department with a group of non-management employees from the same department or location where those employees could discuss individual or common concerns and offer suggestions for improving the work environment. The member of the Human Resources Department in charge of each Coffee Conference prepares a written report of the topics discussed for review by Circuit City's CEO and others in top management. Finally, the record contains evidence that in some instances, Circuit City investigated employee complaints of discrimination and that some of those investigations led to discipline of the targets of the investigations.

II

The jury held Circuit City liable for intentionally refusing to promote Lowery and Peterson on account of their race in violation of § 1981 and Title VII and awarded Lowery and Peterson compensatory and punitive damages. The district court entered judgment in conformity with the jury's verdict, and Circuit City renewed its Rule 50(b) motion, which the district court denied. As noted earlier, the chief substantive issue before us is whether the district court erred in denying Circuit City's Rule 50(b) motion for judgment as a matter of law with respect to Lowery and Peterson's prayer for punitive damages. Before directly addressing this issue, it is necessary that we discuss the close relationship between § 1981 and Title VII in regard to the availability of punitive damages under each statute.

A. Availability of Punitive Damages in General With Respect to Causes of Action for Intentional Discrimination Under 42 U.S.C. § 1981 and Title VII.

Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975). So does Title VII. See 42 U.S.C. § 2000e-2(a)(1); Johnson, 421 U.S. at 457-58. Nearly twenty-five years ago, the Supreme Court sanctioned the prosecution of both of these causes of action by the same plaintiff based upon the same facts. See Johnson, 421 U.S. at 459-62; Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 489 (4th Cir. 1988).

12

A prevailing plaintiff in a cause of action under § 1981 is entitled under the common law to punitive damages "under certain circumstances," Johnson, 421 U.S. at 460; specifically, "for conduct [by the defendant] exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right," Stephens, 848 F.2d at 489. This standard comes directly from the Supreme Court's opinion in Smith v. Wade, 461 U.S. 30 (1983), in which the Court held that punitive damages are available under the common law in an action under 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith, 461 U.S. at 56.

Punitive damages have only been recoverable with respect to an intentional discrimination claim under Title VII since the passage of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Now, a prevailing plaintiff on an intentional discrimination claim under Title VII may recover punitive damages upon demonstration that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his or her] federally protected rights," 42 U.S.C. § 1981a(b)(1), provided the plaintiff cannot recover punitive damages under § 1981, see 42 U.S.C. § 1981a(a)(1).

Notably, in adopting the language embodying the punitive damages standard set forth in § 1981a, Congress looked to the Court's decision in Smith. See Kolstad, 119 S. Ct. at 2124. Furthermore, the legislative history of the Civil Rights Act of 1991 makes clear that Congress intended passage of the Civil Rights Act of 1991 to permit the imposition of punitive damages with respect to an intentional discrimination claim under Title VII "to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981. No higher standard may be imposed." 137 Cong. Rec. H9527 (daily ed. Nov. 7, 1991) (Rep. Edwards' Interpretive Memorandum); see H.R. Rep. No. 102-40(I), at 64-65, 74 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 602-03, 612. Thus, any case law construing the punitive damages standard set forth in § 1981a, for example Kolstad, is equally applicable to clarify the common law punitive damages standard with respect to a § 1981 claim. This fact is significant in the case before us, because given that Lowery and Peterson prevailed under both § 1981 and Title VII, the Civil Rights Act of 1991 only

13

allows them to recover punitive damages under § 1981. <u>See</u> 42 U.S.C. § 1981a(a)(1).

B. Kolstad.

We now turn to consider the legal principles set forth by the Supreme Court in <u>Kolstad</u>. In <u>Kolstad</u>, the Supreme Court carefully examined the language of § 1981a in order to elucidate the circumstances under which punitive damages may be awarded with respect to an intentional discrimination claim under Title VII. Initially, the Court flatly rejected the notion that eligibility for punitive damages can only be described in terms of an employer's"egregious misconduct." <u>See</u> 119 S. Ct. at 2124. In this regard, the Court stated:

> While egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind. Nor does the statute's structure imply an independent role for "egregiousness" in the face of congressional silence.

<u>Id.</u> (internal citations omitted). Additionally, the Supreme Court opined that "§ 1981a's focus on the employer's state of mind gives some effect to Congress' apparent intent to narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination." <u>Id.</u>

The Court then turned to an examination of the terms"malice" and "reckless indifference" as found in § 1981a(b)(1). Critically, the Court emphasized that these terms "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." <u>Kolstad</u>, 119 S. Ct. at 2124. Relying on how it previously interpreted the terms "malice" and "reckless indifference" in its prior precedent, the Court held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." <u>Id.</u> at 2125.

14

The Supreme Court then gave examples of when intentional discrimination does not give rise to punitive damages liability under this standard:

> In some circumstances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bonafide occupational qualification defense or other statutory exception to liability.

Id.

After explaining the import of the terms "malice" and "reckless indifference," the Court made clear that the inquiry as to whether an employer found liable for intentional discrimination under Title VII is subject to punitive damages liability "does not end with a showing of the requisite `malice or . . . reckless indifference' on the part of certain individuals." Id. at 2126 (quoting 42 U.S.C. § 1981a(b)(1)) (ellipsis in original). Rather, if it cannot be said that a principal of the employer actually engaged in the discriminatory conduct at issue, the plaintiff must offer evidence sufficient to impute liability for punitive damages from the individual who did so engage to the employer. See id. at 2126-27.

The Supreme Court then went on to address the proper legal standards for imputing liability to an employer in the punitive damages context. See id. at 2127. Of relevance to the appeal presently before us, the Court held that an employer may be held vicariously liable for a punitive damage award in a Title VII case for the intentionally discriminatory conduct of its employee, where the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply with Title VII. See id. at 2129. The Court specified that in determining whether an employee is in a managerial capacity, a court should review the type of authority that the employer has given to the employee and the

15

amount of discretion that the employee has in what is done and how it is accomplished. See id. at 2128. The Court added that the examples provided in the Restatement (Second) of Torts "suggest that an employee must be important but perhaps need not be the employer's top management, officers or directors to be acting in a managerial capacity." Id. (internal quotation marks omitted).

C. Lowery and Peterson.

Circuit City challenges the district court's refusal to grant its Rule 50(b) motion for judgment as a matter of law with respect to Lowery and Peterson's prayer for punitive damages in regard to their respective failure to promote claims. We review the district court's ruling de novo. See Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993). In so doing, we must affirm the district court's ruling unless we conclude, viewing all the evidence in the light most favorable to Lowery and Peterson, and giving them the benefit of all reasonable inferences, that no reasonable juror could have returned the challenged verdict assessing punitive damages against Circuit City. See id. at 660-61.

In determining whether, taking all the evidence in favor of Lowery and Peterson and giving them the benefit of all reasonable inferences, a reasonable juror could have found Circuit City liable for punitive damages, Kolstad teaches that we must answer a series of questions with respect to each plaintiff. We must first ask whether the record contains sufficient evidence for a reasonable juror to find that in intentionally refusing to promote the plaintiff to the position at issue, the decision maker did so in the face of a perceived risk that her decision would violate federal law. See Kolstad, 119 S. Ct. at 2125. If the answer is no, we should vacate the portion of the judgment awarding the plaintiff punitive damages and direct entry of judgment as a matter of law in favor of Circuit City on that issue. If the answer is yes and, as here in both instances, the decision maker was not a principal, we should next ask whether a reasonable juror could find the decision maker served the employer in a managerial capacity. See id. at 2128-29. Again, if the answer is no, Circuit City prevails. However, if the answer is yes, we must ask whether a reasonable juror could find that the decision maker acted within the scope of her employment in making the challenged decision. See id. at 2129. If the answer is no, Cir-

16

cuit City prevails. Finally, if the answer to this question is yes, we must ask whether a reasonable juror could only conclude that Circuit City engaged in good-faith efforts to comply with § 1981. See id. at 2129; Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999) (analyzing evidence of employer's good-faith efforts of anti-discrimination in context of Rule 50(b) motion). If the answer to this question is yes, Circuit City prevails. If the answer is no, we must affirm the district court's refusal to grant Circuit City's motion for judgment as a matter of law on the issue of punitive damages with respect to that plaintiff.

We now proceed to answer this series of questions with respect to Lowery and Peterson individually.

### 1. Lowery.

#### a. Perceived Risk of Violating Federal Law.

We conclude the record contains sufficient evidence, when viewed in the light most favorable to Lowery and giving her the benefit of all reasonable inferences, for a reasonable juror to find that in intentionally refusing to promote Lowery to the position of Supervisor of Management Recruiting, Turner did so in the face of a perceived risk that her decision would violate federal law. See Kolstad, 119 S. Ct. at 2125. The record contains evidence that Turner knew taking race into account in making significant employment decisions such as denying promotions violates federal law. Specifically, a reasonable juror could infer that Turner had knowledge of the existence of federal anti-discrimination laws from Circuit City's evidence that it required every person in management to attend a week-long training seminar that included education on the federal anti-discrimination laws. See EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999) (holding in a post-Kolstad case that a reasonable jury could have found that the employer intentionally discriminated against its employee on account of his disability in the face of a perceived risk that its action would violate federal law from evidence that the store manager who approved employee's suspension was familiar with the accommodation requirements of the Americans With Disabilities Act and its prohibition against discrimination and retaliation in the workplace).

17

b. Managerial Capacity.

We also conclude that, when the evidence is viewed in the light most favorable to Lowery, and she is given the benefit of all reasonable inferences, a reasonable juror could find that Turner served Circuit City in a managerial capacity. In making this determination, we must consider the type of authority that Circuit City gave Turner and the amount of discretion that she had in what was done and how it was accomplished. See Kolstad, 119 S. Ct. at 2128. Turner managed the entire department responsible for recruiting potential employees to fill non-managerial positions at Circuit City. [4] At the time Turner first assumed the position of manager of the Management Recruiting Department she supervised nine recruiters. Circuit City gave Turner authority to expand the department such that by the time of trial, October 1996, Turner's department had twenty-one recruiter positions. Turner had authority to hire persons to fill budgeted positions in her sole discretion without first consulting her boss Zierden. Circuit City also allowed Turner the discretion to organize her department any way she wanted. From this evidence, a reasonable juror could find that Turner served Circuit City in a managerial capacity for purposes of vicarious liability in the punitive damages context. Although Turner was not top management, nor an officer or director of the corporation, she nonetheless held an important position at Circuit City. See Wal-Mart Stores, Inc., 187 F.3d at 1247 (holding in a post-Kolstad case that Wal-Mart assistant store manager occupied managerial position for purposes of vicarious liability in the punitive damages

---

[4] In addition to the responsibility of recruiters to attend job fairs and engage in other recruitment efforts, Turner testified that her department performs the following functions:

> Managers will call to ask for assistance in filling positions. Other Human Resources Associates throughout the country will call for assistance in designing and placing recruitment advertising, designing fliers, designing posters. We also provide phone-screening support, phone interviews, for all of our new stores around the country. So we might have District Managers or Personnel Managers on the phone asking for assistance. It is a wide variety of Associates within the company whom we consider a customer.

(Plaintiff's Supplemental Appendix on Remand 136).

18

context where assistant manager had independent authority to suspend her subordinates and could also make hiring and firing recommendations; and holding that Wal-Mart store manager occupied managerial position for purposes of vicarious liability in the punitive damages context where responsibilities of store manager include ensuring the smooth operation of the store and making hiring and firing decisions).

      c. <u>Scope of Employment.</u>

Under <u>Kolstad</u>, the next inquiry is whether Turner acted within the scope of her employment in refusing to promote Lowery on account of her race. <u>See Kolstad</u>, 119 S. Ct. at 2128. Under <u>Kolstad</u>, the applicable test is whether Turner's conduct is of the kind Turner was employed to perform, occurred substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer. <u>See id.</u> (adopting Restatement (Second) of Agency's scope of employment test for intentional torts but modifying it to provide a good-faith exception). The evidence, when viewed in the light most favorable to Lowery, and giving Lowery the benefit of all reasonable inferences, is more than sufficient to meet this test.[5] Selecting persons for promotion is the kind of conduct Circuit City employed Turner to perform. Furthermore, Turner's failure to promote Lowery occurred during working hours and on company property. Finally, the evidence supports a finding that Turner failed to promote Lowery at least in part for the purpose of serving Circuit City.

      d. <u>Good-Faith Efforts to Comply with Title VII.</u>

Thus far, the evidence, when viewed in the light most favorable to Lowery, and giving her the benefit of all reasonable inferences, is sufficient to establish: (1) that Turner, acting as an agent for Circuit City, intentionally refused to promote Lowery on account of her race (as found by the jury) in the face of a perceived risk that doing so would violate federal law; (2) that Turner served Circuit City in a managerial capacity; and (3) that Turner acted within the scope of her employment in refusing to promote Lowery. Nonetheless, we must vacate the

_____

**5** Circuit City does not seriously dispute that the scope of employment test, without considering the good-faith exception, is met here.

punitive damages portion of the judgment in favor of Lowery, if we conclude, after viewing the evidence in the light most favorable to Lowery, and giving her the benefit of all reasonable inferences, that a reasonable juror could only conclude that Circuit City engaged in good-faith efforts to comply with § 1981. See Kolstad, 119 S. Ct. at 2129; Deffenbaugh-Williams, 188 F.3d at 286 (analyzing evidence of employer's good-faith efforts of anti-discrimination in context of Rule 50(b) motion). This good-faith exception rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself "never acted in reckless disregard of federally protected rights." Kolstad, 119 S. Ct. at 2129 (internal quotation marks omitted). On the issue of its alleged good-faith efforts to comply with § 1981, Circuit City chiefly points us to its efforts to educate its employees about its company-wide policy entitled"Treating Associates with Respect" and the three avenues of complaint allegedly available to Circuit City employees suspicious of illegal employment discrimination in the workplace--the Open Door Policy, the Associate Cool Line, and Coffee Conferences. According to Circuit City's "Treating Associates with Respect" policy, Circuit City allegedly committed not to discriminate against its employees on account of factors made illegal by federal anti-discrimination statutes such as § 1981 and Title VII. The record contains evidence that Circuit City sent out posters reflecting this policy to its retail stores, included the policy in its 1991 employee handbook, conducted some individual employee training sessions regarding the policy in 1991 or 1992, and required every managerial and supervisory employee to attend a week-long training seminar called "Managing Through People," a small part of which included education on the federal anti-discrimination in employment laws.

Countering Circuit City's evidence of its alleged good-faith efforts to comply with § 1981 is evidence in the record: (1) that two top Circuit City executives harbor racial animosity toward African-Americans;[6] (2) that one of these top executives buried two internal

_____

[6] Here, we are referring to Zierden and Ligon. When the following comments by Zierden are viewed in the light most favorable to Lowery, a reasonable juror could find that Zierden harbored racial animus toward African-Americans: (1) "the caliber of minorities and blacks who are in

20

reports reflecting a negative attitude on behalf of Circuit City against racial minorities and failed to take any remedial action in response to the negative findings in the reports; (3) that African-American employees feared retaliation by Circuit City for use of the Open Door Policy, the Associate Cool Line, and Coffee Conferences to complain about discrimination; and (4) that several African-American employees and former employees of Circuit City felt intimidated by Circuit City in response to their complaints to management about racial animus in promotion procedures. Finally, while the fact that Circuit City had a very subjective and unstructured promotional system in place does not alone suggest a secret corporate policy at Circuit City to keep African-Americans in low level positions, see Vaughan v. Metrahealth Cos., 145 F.3d 197, 204 (4th Cir. 1998), when this fact is coupled with the fact that the Circuit City executive responsible for the system harbors racial animus towards African Americans, a reasonable juror could infer that the system was implemented in an effort to mask such a corporate policy, see Barnett v. W.T. Grant Co., 518 F.2d 543, 550 (4th Cir. 1975) (recognizing the capacity of non-objective hiring standards to mask employer's refusal to hire because of race).

After considering the conflicting evidence just set forth regarding the good-faith efforts issue, we are not persuaded that a reasonable juror could only conclude that Circuit City engaged in good-faith

_____

the company, in Circuit City, would not meet the standards for a corporate headquarters job," (J.A. 3145); (2) blacks who worked for Circuit City "had a propensity to steal," (J.A. 3145-46); (3) "he didn't see th[e] situation [of few if any African-Americans in decision making roles at Circuit City] changing anytime soon because . . . those people who would be maybe [sic] eligible to be promoted just weren't there," (J.A. 3148), and (4) "when you hire a black store manager, sales go down, customers come in and wonder what's going on," (J.A. 2135).

When the following comments by Ligon are viewed in the light most favorable to Lowery, a reasonable juror could find that Ligon harbored racial animus toward African-Americans: (1) Lowery, an African-American, "should go to a company that's more receptive to minorities," (J.A. 2091-92); and (2) Lowery should go to a company like Pepsi Cola that "put [minorities] in decision-making roles," (J.A. 2091).

21

efforts to comply with § 1981. While an employer's institution of a written policy against race discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind with respect to racial minorities, such a policy is not automatically a bar to the imposition of punitive damages. See Harris v. L & L Wings, Inc., 132 F.3d 978, 983-84 (4th Cir. 1997). Here, the sincerity of Circuit City's commitment to a company-wide policy against racial discrimination in the workplace is called into question when one considers the racially discriminatory attitudes of two top Circuit City executives and the implementation of a promotional system by one of those executives having the capacity to mask race discrimination in promotional decisions. Furthermore, the positive nature of Circuit City's Open Door Policy, Associate Cool Line, and Coffee Conferences in reflecting Circuit City's attempt to offer employees an avenue to complain about racial discrimination without intimidation or fear of retaliation is countered by evidence of employees who testified they felt ignored or intimidated for complaining about promotion procedures and feared retaliation if they used one of these venting procedures to complain about racial animus among Circuit City management. Other evidence suggesting that Circuit City's purported efforts to comply with § 1981 were not taken in good-faith, but with the intent to cover-up a corporate policy of keeping African-Americans in low level positions, is Zierden's burying of the Booth and Cook reports. Because we are unable to conclude that a reasonable juror could only find that Circuit City engaged in good-faith efforts to comply with § 1981, and because we conclude that in intentionally failing to promote Lowery, Turner acted in the face of a perceived risk that her action violated federal law, in a managerial capacity, and within the scope of her employment, we hold the district court did not err in denying Circuit City's Rule 50(b) motion with respect to Lowery's prayer for punitive damages on her § 1981 claim. Accordingly, we affirm the portion of the judgment entered in favor of Lowery awarding her punitive damages.

2. Peterson.

a. Perceived Risk of Violating Federal Law.

We conclude the record contains sufficient evidence, when viewed in the light most favorable to Peterson, and drawing all reasonable

22

inferences in her favor, for a reasonable juror to find that in intentionally refusing to promote Peterson to the position of Assistant Supervisor of the Customer Service Mail Department, Bischoff did so in the face of a perceived risk that her decision would violate federal law. See Kolstad, 119 S. Ct. at 2125. Specifically, a reasonable juror could infer that Bischoff had knowledge of the existence of federal anti-discrimination laws from Circuit City's evidence that it required every person in management to attend a week-long training seminar that included education on the federal anti-discrimination in employment laws. See Wal-Mart Stores, Inc., 187 F.3d at 1246.

### b. Managerial Capacity.

We also conclude that, when the evidence is viewed in the light most favorable to Peterson, and all reasonable inferences are drawn in her favor, a reasonable juror could find that Bischoff served Circuit City in a managerial capacity. In making this determination, we must consider the type of authority that Circuit City gave Bischoff and the amount of discretion that she had in what was done and how it was accomplished. See Kolstad, 119 S. Ct. at 2128. Bischoff managed the Customer Service Mail Department at FNANB, the wholly-owned subsidiary of Circuit City. She had three supervisors reporting to her; each supervisor had an assistant supervisor; and approximately fifteen employees reported to each assistant supervisor. Bischoff had the authority to make personnel decisions, including promotional decisions, without guidelines or review, and thus was able to make personnel decisions without any objective criteria or accountability. Although several layers of management existed above Bischoff at FNANB, a reasonable juror could find from this evidence that Bischoff served FNANB in a managerial capacity for purposes of vicarious liability in the punitive damages context. See Wal-Mart Stores, Inc., 187 F.3d at 1247.

### c. Scope of Employment.

Under Kolstad, the next inquiry is whether Bischoff acted within the scope of her employment in refusing to promote Peterson on account of her race. See Kolstad, 119 S. Ct. at 2128. The applicable test is whether Bischoff's conduct is of the kind she was employed to perform, occurred substantially within the authorized time and

23

space limits, and is actuated, at least in part, by a purpose to serve the employer.**7** See id. The evidence, when viewed in the light most favorable to Peterson, is sufficient to meet this test. Selecting employees for promotion is the kind of conduct Circuit City employed Bischoff to perform. Furthermore, her failure to promote Peterson occurred during working hours and on company property. Finally, the evidence supports an inference that Bischoff failed to promote Peterson at least in part for the purpose of serving Circuit City.

   d. Good-Faith Efforts.

Given our treatment of Circuit City and FNANB as a single employer, our analysis of the good-faith efforts issue with respect to Lowery applies equally with respect to Peterson. Accordingly, we hold the district court did not err in denying Circuit City's Rule 50(b) motion with respect to Peterson's prayer for punitive damages on her § 1981 claim. We, therefore, affirm the portion of the judgment entered in favor of Peterson awarding her punitive damages.

III

Our resolution of the punitive damages issue on remand from the Supreme Court necessitates our revisiting the propriety of the district court's general award of attorneys' fees and costs due the Plaintiffs. In part VII of Lowery I, we held that viewing the case as a whole, including the fact that Lowery and Peterson recovered only $16,700 in compensatory damages, the Plaintiffs achieved a very low degree of success. See id. at 767-68. In light of this, we held that the district court abused its discretion in awarding the Plaintiffs all of their accrued attorneys' fees and costs amounting to nearly $4 million. See id. at 768. We then vacated the district court's general award of attorneys' fees and costs and remanded the case to the district court for a redetermination of the award in light of our opinion. See id.

While we still believe the district court abused its discretion in granting the Plaintiffs a general award of attorneys' fees and costs in the amount of nearly $4 million, we acknowledge that our affirmance

_____

**7** Circuit City does not seriously dispute that this scope of employment test, without considering the good-faith exception, is met here.

24

on remand of the judgments in favor of Lowery and Peterson with respect to the award of punitive damages means the Plaintiffs achieved a higher degree of success in the case than we first determined. Accordingly, we vacate the district court's general award of attorneys' fees and costs, remand the case to the district court for a redetermination of the amount of the award in light of the same sentiments we expressed on the issue in Lowery I, with the modification that the Plaintiffs have achieved a higher degree of success than we determined in Lowery I.

IV

In conclusion, we hold the district court did not err in refusing to grant Circuit City's Rule 50(b) motion with respect to Lowery and Peterson's prayer for punitive damages in regards to their § 1981 claims. Accordingly, we affirm the judgments in favor of Lowery and Peterson to the extent they award Lowery and Peterson punitive damages. We vacate the district court's general award of attorneys' fees and costs in favor of the Plaintiffs and remand the case for a redetermination of the award in accordance with this opinion. Finally, without further discussion, we reaffirm our holdings and analysis as stated in Lowery I with respect to the issues raised on appeal by Circuit City and on cross appeal by the Plaintiffs that are unrelated to the issue of punitive damages and the general award of attorney's fees and costs.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH INSTRUCTIONS

25