PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellee,*

v.

FEDERAL EXPRESS CORPORATION, d/b/a
FedEx Express,

*Defendant-Appellant.*

No. 06-1724

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:04-cv-03129-WDQ)

Argued: September 25, 2007

Decided: January 23, 2008

Before KING and GREGORY, Circuit Judges,
and Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Gregory and Judge Wilson joined.

---

## COUNSEL

**ARGUED:** Edward John Efkeman, FEDERAL EXPRESS CORPO-
RATION, Memphis, Tennessee, for Appellant. Davis L. Kim,
UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY

COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Ronald S. Cooper, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee.

---

**OPINION**

KING, Circuit Judge:

Federal Express Corporation ("FedEx") appeals from a March 2006 judgment for compensatory and punitive damages entered against it in the District of Maryland. The Equal Employment Opportunity Commission (the "EEOC") sued FedEx on behalf of former FedEx package handler Ronald Lockhart. By its judgment, the district court awarded Lockhart, who is disabled due to deafness, the sums of $8,000 in compensatory damages and $100,000 in punitive damages, premised on a jury finding against FedEx for failing to reasonably accommodate Lockhart under the Americans with Disabilities Act (the "ADA"). *See* 42 U.S.C. § 12112(b)(5)(A). On appeal, FedEx maintains that the district court erred in failing to grant judgment as a matter of law or, alternatively, a remittitur, on two bases: (1) that there was insufficient evidence on which to submit the question of punitive damages to the jury; and (2) that the punitive damages award was constitutionally excessive. As explained below, we reject these contentions and affirm.

I.

A.

Ronald Lockhart, a resident of College Park, Maryland, has been profoundly deaf since his birth in 1959. He is unable to either speak or read lips, but is fluent in American Sign Language ("ASL"), which is his primary language. He studied English formally, but has never mastered the language. Lockhart uses ASL to communicate with his wife, who is also deaf, and with his children.

Between March 2000 and January 2003, while a full-time under-

graduate student at the University of Maryland, Lockhart was employed by FedEx as a package handler at FedEx's Baltimore-Washington International Airport facility (the "FedEx-BWI Ramp"). He worked approximately twenty-five hours per week between 2:00 a.m. and 7:00 a.m. on various night shifts. While working for FedEx, Lockhart made repeated requests for an ASL interpreter and other accommodations, so that he could understand what occurred at employee meetings and training sessions.[1]

On October 17, 2001, Lockhart filed a formal charge of discrimination with the EEOC against FedEx, alleging that it had violated the ADA by denying him reasonable accommodations for his deafness disability. In July 2002, the EEOC determined that FedEx had discriminated against Lockhart by repeatedly denying him ASL translation "for full participation in meetings, training, and safety and security events." J.A. 715.[2] The EEOC advised that it would initiate conciliation proceedings with FedEx to resolve the issues presented by Lockhart's discrimination charge. Any such proceedings were apparently unsuccessful, and, on January 17, 2003, FedEx discharged Lockhart from his employment at the FedEx-BWI Ramp, citing deficient attendance as the reason for its decision. Lockhart thereafter filed an additional charge with the EEOC, alleging that his discharge by FedEx had been retaliatory.

B.

On September 30, 2004, the EEOC filed its complaint against FedEx in the District of Maryland. The complaint alleged that FedEx had violated the ADA by failing to provide reasonable accommodations to Lockhart, and that FedEx had unlawfully terminated Lockhart in retaliation for the discrimination charge he filed with the EEOC. As relevant here, the complaint sought both compensatory and puni-

---

[1]Prior to his employment with FedEx, Lockhart worked for approximately sixteen years as a janitor at a Veterans Administration Hospital in California and at Gallaudet University in Washington, D.C. Both employers provided ASL interpreters for Lockhart at meetings and workshops related to his employment.

[2]Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

tive damages, alleging that FedEx had acted with malice and reckless indifference to Lockhart's federally protected rights, and that it had failed to act in good faith. The case was thereafter tried before a jury in Baltimore, over the four day period from February 27 to March 2, 2006.

1.

At trial, the EEOC established that Lockhart's supervisors were always aware of his disability. They were also familiar with the ADA and FedEx's obligations thereunder, but nevertheless failed to provide ASL translation assistance or other accommodations to Lockhart at employee meetings and training sessions.[3]

a.

When Lockhart first interviewed for the FedEx package handler position with FedEx-BWI Ramp Operations Manager Ronald Thompson in the spring of 2000, Thompson declined Lockhart's request that FedEx provide him an ASL interpreter for the interview. As a result, it was necessary for Lockhart to bring a friend to translate during the interview, and for the friend to also assist at a multi-day orientation training session that followed Lockhart's hiring. Lockhart explained that he supplied his own interpreter for these initial events because he "really wanted the job," and because he "felt as if [he] had no other choice." J.A. 148. Immediately after hiring Lockhart, Thompson informed his own supervisor, Pat Hanratty, about Lockhart's disability. As the Senior Operations Manager for FedEx at the BWI Ramp, Hanratty bore ultimate responsibility for all FedEx personnel matters there. Upon learning that Thompson had hired a deaf employee, Hanratty immediately "ask[ed Thompson] why" he had done so. *Id.* at 489.

---

[3]At trial, the EEOC called six witnesses, including Lockhart, to testify on its behalf. FedEx also called several witnesses in support of its defense. In assessing the issues raised in this appeal, we are obliged to view the evidence in the light most favorable to the EEOC, as the prevailing party at trial, drawing all reasonable inferences in its favor. *See ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.*, 472 F.3d 99, 113 (4th Cir. 2006).

b.

As a package handler at the FedEx-BWI Ramp, Lockhart's duties included sorting, scanning, and stacking packages and letters, as well as attending employee meetings and training sessions. Such events included daily briefings conducted prior to each work shift, monthly meetings (often supplemented with video presentations) of up to two hours, plus quarterly meetings and occasional training sessions. These mandatory meetings and training sessions were used by FedEx to address essential topics for its employees, such as workplace safety, job training, and employee benefits. Although Lockhart did not need or request any accommodations with respect to the routine handling of packages, he was "unable to understand what [was] going on in the meetings" and training sessions without an ASL interpreter or other accommodations. J.A. 670.

From the time Lockhart began working for FedEx in March 2000 until his discharge in January 2003, he made repeated requests to his supervisors for the accommodations necessary to enable him to reasonably comprehend and participate in employee meetings and training sessions. On multiple occasions, Lockhart asked his supervisors for complete notes from the daily briefings, and for ASL translation and closed-captioning assistance at monthly meetings. In July 2000, Victor Cofield, a FedEx-BWI Ramp Operations Manager, replaced Thompson as Lockhart's direct supervisor. Cofield served as such for most of the nearly three-year period of Lockhart's FedEx employment, and thus was the point of contact for many of Lockhart's requests for accommodations.

The EEOC's evidence at trial demonstrated that Cofield routinely ignored Lockhart's requests for accommodations. Lockhart received only sporadic notes from his supervisors or co-workers, which briefly summarized some of the meetings and training sessions. Lockhart "almost never" received notes from the daily meetings, and he was "very frustrated" that, although his co-workers were being given essential information concerning their jobs, he had "no way of knowing" what topics were being discussed. J.A. 154. During the first two years of his FedEx employment, Lockhart received no ASL interpretation or closed-captioning accommodations for any employee meetings. On multiple occasions, Lockhart was not advised when such meetings

were to occur. During the various training sessions, Lockhart was sometimes provided with closed-captioned videos, but he was never provided with ASL translations of live presentations. According to Lockhart, he thus felt "frustrated" and "very behind." *Id.* at 157. He told the jury that several of his co-workers "kept giving me pity or saying they felt sorry for me and sad for me because I didn't know what was going on and that I was missing so much." *Id.* Often, it was Lockhart's co-workers who provided him with meeting notes, apparently on their own volition.

Cofield knew that English was Lockhart's second language, and Lockhart admitted that his use of written English was, in his own words, "not very good." J.A. 224. Nevertheless, for most of the three-year period that he worked for FedEx, Cofield resorted to writing notes in English as his sole means of communicating with Lockhart. In that regard, Cofield even relied on Lockhart to supply the materials necessary for writing such notes. On days when Lockhart did not bring a notepad, Cofield recalled, "we would find a piece of paper somewhere, . . . out of a trash can, off the floor or something, and write [notes]." *Id.* at 314. On at least three occasions, Cofield asked another FedEx employee — who was somewhat familiar with ASL but not certified as an ASL interpreter — to translate for Lockhart. Lockhart had difficulty comprehending this employee's ASL translations because, although the employee could use the ASL alphabet to spell English words, he was not fluent in the ASL language.

FedEx personnel records indicate that Lockhart completed twenty-four separate company-administered training courses — including courses on how to avoid workplace violence, how to recognize and interpret hazard labels on packages, and how to safely handle dangerous materials. According to these records, Lockhart performed satisfactorily in all of the graded training sessions. On those occasions when FedEx required its employees to take computerized tests at the conclusion of a training session, however, FedEx would direct a "team leader" to sit with Lockhart at his computer and answer test questions for him if he made incorrect answers. As Lockhart recalled, "the team leader would . . . move[ ] me out of the way and start[ ] taking the test for me." J.A. 165-66. One such team leader, Marvin Redd, acknowledged that, after helping Lockhart take such tests "four or five times," Redd advised Cofield that Redd "couldn't do it anymore,"

because he "kind of felt like [he] was belittling [Lockhart] as a person." *Id.* at 445. Thereafter, Cofield himself corrected Lockhart's incorrect answers. Lockhart was "very embarass[ed]" by the test-taking arrangements, because his co-workers necessarily assumed that he was "just stupid." *Id.* at 166.

Lockhart's need for accommodations became particularly acute after the events of September 11, 2001, when the FedEx managers at BWI convened several meetings on security issues, covering subjects such as potential anthrax exposure. Because he was denied ASL translation assistance and meeting notes, Lockhart was unable to effectively participate in these security meetings. As a result, Lockhart felt "very paranoid" and "emotional," and he was "concerned about [his] own safety," due to the vast amount of information that he was not receiving. J.A. 167. "[M]y co-workers started to feel very concerned for me," Lockhart testified, "because there was so much information that I wasn't getting, and they were concerned for my safety." *Id.*

In late 2001, revised federal aviation regulations were promulgated requiring all FedEx-BWI Ramp employees to obtain and wear security badges while at work. Lockhart was unable to obtain his security badge, however, because he lacked the assistance of an ASL interpreter; he thus had to work without a security badge for several months, in violation of the regulations. During that period, Lockhart feared that he would be fired or laid off for not having his required security badge.

c.

Almost two years after Lockhart was first hired at the FedEx-BWI Ramp, Cofield gradually began to provide accommodations for his deafness. In January 2002, Cofield made a certified ASL interpreter, Derwood O'Quinn, available to assist Lockhart in obtaining his security badge. O'Quinn had served as an ASL interpreter for FedEx at its facilities at BWI and nearby Dulles International Airport since 2001. Although Cofield was aware of Lockhart's ongoing need for an ASL interpreter, he made O'Quinn available to Lockhart on a limited basis only. For example, Cofield provided Lockhart with O'Quinn's services at only some of the monthly meetings conducted between Janu-

ary 2002 and the termination of Lockhart's employment in January 2003. On occasion, O'Quinn would merely translate the video portions of the meetings, doing so the day after the actual meeting had occurred. Lockhart never received ASL translation assistance for any daily briefings, training sessions, or quarterly meetings with FedEx's senior management.

Sometime in the fall of 2002, Cofield began ordering closed-captioned versions of training videos used in the FedEx monthly meetings. Cofield did not, however, provide Lockhart with notes from the daily briefings on a consistent basis until December 2002. Cofield began providing Lockhart with notes from the monthly meetings around the same time, although Cofield admitted that such notes were only the bulleted outlines of such meetings, as prepared for all package handlers. Even then, the notes were made available for some, but not all, of the monthly meetings. Significantly, it was not until January 2003 — nearly three years after he began working at the FedEx-BWI Ramp, and just a few weeks after Cofield first learned that Lockhart had filed his discrimination charge with the EEOC — that Lockhart was provided with FedEx's approved form for requesting disability accommodations. Lockhart was discharged that same month.

d.

Since 1991, FedEx has maintained an internal ADA compliance policy, guaranteeing reasonable accommodations to its disabled employees. The details of this compliance policy — including the reasonable accommodations requirement — are spelled out in a FedEx human resources policy manual called the "People Manual."[4] Han-

---

[4]FedEx's ADA compliance policy, as set forth in the People Manual, specifies, inter alia, that FedEx "provides reasonable accommodation in the employment of the handicapped upon request where such accommodation does not cause undue hardship." J.A. 832. The compliance policy includes a definition for, and provides examples of, reasonable accommodations, and it lays out guidelines for what may constitute undue hardship to FedEx. It also references a complaint procedure by which written complaints of violations of the compliance policy may be filed. As written, the grievance procedure appears to be available only to "[d]isabled applicants." *Id.*

ratty, as the Senior Operations Manager at the FedEx-BWI Ramp, acknowledged at trial that he was aware of FedEx's ADA compliance policy, and that he had received ADA training from FedEx. Hanratty admitted being familiar with the ADA's requirement that employers make reasonable accommodations for their disabled employees. Strikingly, however, during Lockhart's employment with FedEx, Hanratty never utilized the People Manual to ascertain how to accommodate Lockhart's deafness disability.

Moreover, although Hanratty was responsible for all personnel matters at the FedEx-BWI Ramp, he failed to ensure that FedEx's ADA compliance policy was implemented there. Hanratty's subordinate, Cofield, who directly supervised Lockhart, had never received any ADA training from FedEx. And, prior to Lockhart being hired, Cofield had never supervised a deaf employee at FedEx. Cofield acknowledged that he asked Hanratty for ADA training, but that he had received none. Indeed, in Cofield's words, "[t]here was no ADA training at Federal Express." J.A. 370.

After reaching a dead end with Hanratty, Cofield made several futile efforts to obtain clarification from other senior FedEx officials about FedEx's ADA-mandated obligation to accommodate Lockhart's disability. At one point, Cofield sought advice on such obligations from an official in FedEx's legal department, described by Cofield as"a guy down at the Beltsville location." J.A. 329. Cofield admitted discussing the ADA requirements of "reasonable accommodations" with this legal department official, including the importance of "making sure we kept the lines of communication open, that . . . safety was number one, and . . . providing [Lockhart] with any . . . written documentation that we could." *Id.* On two occasions in 2002, Cofield contacted FedEx official Virginia Connors (at "corporate headquarters") on the Lockhart situation, seeking, in his words, to "get a definition of what reasonable accommodations [were]." *Id.* at 330. Although Cofield was familiar with the People Manual and referred to it to identify other employment policies, he was never, in his multiple conversations with Hanratty and other FedEx officials, directed "to go to a disability policy my entire career as it related to the ADA." *Id.* at 372.

On one occasion in 2002, Lockhart advised Cofield that FedEx was regularly providing an ASL interpreter for a hearing impaired

employee at a FedEx ramp facility in Ohio. As a result, Cofield con-
tacted Hank Arrington, FedEx's Senior Personnel Representative for
the FedEx-BWI Ramp, about the Ohio ASL arrangements. Arrington
lacked knowledge of the Ohio situation, and requested further details
from Cofield on the location of the deaf employee (although FedEx
apparently had only one ramp facility in Ohio). Cofield, however, did
not follow up with Arrington on the hearing impaired employee in
Ohio.

In contrast to Cofield, Hanratty knew that the FedEx facility at
Dulles employed deaf individuals. Nevertheless, Hanratty did not
contact Tony Russell, his managerial counterpart at Dulles, to ascer-
tain whether ADA accommodations were being provided for such
employees. Cofield then spoke with Russell, who told him that he had
an ASL interpreter — Derwood O'Quinn — assist him at Dulles.
Cofield immediately contacted O'Quinn and got approval to hire him
to "come in and do meetings and written reviews." J.A. 327. Notably,
even after Cofield began using O'Quinn in 2002 to provide ASL
interpretation assistance for Lockhart at monthly meetings, no such
ASL accommodation was provided for Lockhart at his quarterly
meetings with Hanratty.

Hanratty acknowledged that, as of January 2003, he had known
about Lockhart's EEOC charge "for years." J.A. 479. Indeed, the ini-
tial contact with FedEx about the EEOC charge was mailed to Han-
ratty by certified mail at the FedEx-BWI Ramp. Hanratty did not,
however, advise Cofield about the charge, or seek to verify that
FedEx's procedures for addressing such allegations had been com-
plied with. Cofield, on the other hand, did not know of Lockhart's
EEOC charge until December 2002, when Connors sent him an email
concerning it. Thereafter, in January 2003, Cofield provided Lockhart
with FedEx's official form for requesting ADA accommodations.
Cofield admitted at trial, however, that even in early 2003 he did not
know what an EEOC charge was.

2.

Following the presentation of the foregoing and other evidence to
the jury, the trial proceeded with the jury instructions of the court, the

closing arguments of counsel, the jury deliberations, and the return of the verdict. We briefly summarize those aspects of this case.

At the conclusion of the evidence, FedEx moved, pursuant to Federal Rule of Civil Procedure 50(a), for judgment as a matter of law. The trial court denied the Rule 50(a) motion, however, and proceeded to instruct the jury on the legal principles applicable to the EEOC's two claims against FedEx. Of note, FedEx made no objections to the jury instructions. On the factual issue of whether Lockhart had requested that ADA accommodations be made, the jury was instructed, inter alia, that although a disabled employee possesses a general responsibility to inform his employer that such accommodations are necessary, "the need for a request may be excused altogether when a known disability interferes with an employee's ability to make a request." J.A. 572. In such a circumstance, "the employer must make a reasonable effort to understand what [the] needs are." *Id.* at 573.[5] An important aspect of the punitive damages instruction, which is not contested on appeal, was that

> [a]n award of punitive damages will be appropriate in this case only if you find for the EEOC and then further find from a preponderance of the evidence: First, that a higher management official of FedEx personally acted with malice or reckless indifference to Mr. Lockhart's federally-protected rights; and, second, that FedEx itself had not acted in good faith in an attempt to comply with the law by adopting policies and procedures designed to prohibit such discrimination in the workplace.

*Id.* at 578. The instructions did not specify which FedEx personnel could be deemed to be higher management officials.

---

[5]With regard to an employee's obligation to inform his employer about needed ADA accommodations, the court explained to the jury that "this burden is not a great one. The employee does not have to mention the ADA or use the phrase 'reasonable accommodation.' Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability." J.A. 572.

In the context of its punitive damages instruction, the court advised the jury on the good-faith issue that

> an employer may not be held liable for punitive damages because of discriminatory acts on the part of its managerial employees where those acts by such employees were contrary to the employer's own good faith efforts to comply with the law by implementing policies and programs designed to prevent such unlawful discrimination in the workplace.

J.A. 578. The court further emphasized that a "party that . . . delays the interactive process is not acting in good faith." *Id.* at 573. In addition, the instructions advised that a "party who fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.*

On March 2, 2006, the jury returned its verdict, by way of a "Special Verdict Form," finding, inter alia, that the EEOC had proven by a preponderance of the evidence that FedEx had violated the ADA by failing to provide reasonable accommodations to Lockhart. The verdict specified that "a higher management official of Federal Express acted with malice or reckless indifference to [Lockhart's] federally protected rights," and that "FedEx did *not* act in a good faith attempt to comply with the law by adopting policies and procedures designed to prohibit such discrimination in the workplace." Special Verdict Form, 1-2, Mar. 2, 2006.[6] On the other hand, the jury rejected the EEOC's contention that FedEx had terminated Lockhart in retaliation for filing a charge with the EEOC. By its verdict, the jury awarded Lockhart the sum of $8,000 in compensatory damages, plus $100,000 in punitive damages. The aggregate of these two damage awards

---

[6]During its deliberations, the jury on one occasion submitted questions to the court, including a query relating to FedEx's asserted good-faith efforts: "[A]re we to judge whether FedEx acted in good faith to comply with the law based on the company's stated policies and procedures, or on the Baltimore ramp's performance complying with those policies and procedures?" J.A. 588. In response, the court simply referred the jury to its earlier instructions.

($108,000) was below the $300,000 statutory maximum prescribed for such employers as FedEx.[7]

### C.

In the post-trial proceedings, FedEx renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), maintaining that the evidence was insufficient to support the jury's award of punitive damages. FedEx moved in the alternative for a remittitur. The trial court denied the Rule 50 relief by its Opinion and Order of April 25, 2006, concluding simply that "[t]he EEOC . . . produced sufficient evidence — accepted by the jury — contradicting FedEx's contentions." J.A. 654. The court also denied the motion for a remittitur of the punitive damages award, being satisfied that "the award in this case falls within the range that Congress has determined to be reasonable." *Id.* at 655. FedEx has filed a timely appeal, maintaining that the trial court erred in denying its motion for judgment as a matter of law, because the evidence was insufficient to support the punitive damages award. Additionally, FedEx contends that the court erred in rejecting its alternative request for a remittitur, in that the punitive damages award was unconstitutionally excessive.[8] We possess jurisdiction pursuant to 28 U.S.C. § 1291.

### II.

We review de novo a district court's denial of a post-trial motion for judgment as a matter of law on a punitive damages award. *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000). Upon conducting such review, we are obliged to affirm the district court's ruling unless we conclude — viewing the evidence in the light most favorable to the plaintiff, and giving the plaintiff the benefit of all reasonable inferences — that no reasonable jury could have made the punitive damages award being challenged. *See id.*

---

[7]Under the ADA, the sum of any compensatory and punitive damages awarded by a jury is limited, "in the case of a respondent who has more than 500 employees," to $300,000. 42 U.S.C. § 1981a(b)(3)(D).

[8]FedEx does not, in its appeal, challenge the propriety of the jury's compensatory damages award.

We generally review for abuse of discretion a district court's denial of a motion for a remittitur. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998). When, however, a remittitur is being sought on a punitive damages award alleged to be constitutionally excessive, our review must be de novo. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001) ("[C]ourts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards.").

III.

A.

We first address FedEx's contention that the district court erred in denying its Rule 50 motion for judgment as a matter of law on the punitive damages award. The ADA was enacted in 1990 to expand the civil rights protections of individuals with disabilities. *See* 42 U.S.C. § 12101(b)(3)-(4) (declaring purpose of ADA to "ensure that the Federal Government plays a central role in enforcing the standards established in [the ADA] on behalf of individuals with disabilities" and "to invoke the sweep of congressional authority, . . . to address the major areas of discrimination faced day-to-day by people with disabilities"). Title I of the ADA prohibits discriminatory acts and omissions that abrogate the employment rights of disabled people, including the failure of an employer to make reasonable accommodations for an applicant or an employee's disability. *See* 42 U.S.C. § 12112(b)(5)(A) (defining "discriminate" as, inter alia, the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]"). The ADA incorporates the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, which are governed in turn by § 1981a of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. *See* 42 U.S.C. § 12117(a).

Pursuant to § 1981a, a plaintiff seeking punitive damages on an ADA claim must prove that his employer acted with the requisite

state of mind — that is, that it "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1). In 1999, the Supreme Court recognized, in *Kolstad v. American Dental Association*, that the statutory requirement of malice or reckless indifference may be proven in the alternative. As a result, proof of "actual malice" is unnecessary for a finding of punitive damages liability if, at a minimum, the plaintiff is able to prove "recklessness in its subjective form." 527 U.S. 526, 536 (1999) (citing *Smith v. Wade*, 461 U.S. 30, 45-48 (1983)). The *Kolstad* Court explained that, in order to prove such recklessness, a plaintiff must establish that his employer "at least discriminate[d] in the face of a perceived risk that its actions [would] violate federal law." *Id.* The Court also observed that the evidence must be sufficient to impute punitive damages liability to the employer. *Id.* at 539. In this regard, the Court explained that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with" the applicable federal law. *Id.* at 545 (internal quotation marks omitted).

In this trial, the EEOC relied on a theory of reckless indifference to prove its claim for punitive damages against FedEx.[9] Applying the *Kolstad* principles, we have heretofore explained that, for a punitive damages award to be justified on the basis of reckless indifference, the evidence must be sufficient for a reasonable jury to make four findings:

> (1)   That the employer's decision maker discriminated in the face of a perceived risk that the decision would violate federal law;

---

[9]Notably, the trial court instructed the jury that it was entitled to award punitive damages if it found that a FedEx managerial official had acted with either malice or reckless indifference. Although the EEOC has not conceded that there was insufficient evidence of malice, the evidence need not have proven malice. To sustain the punitive damages award, the evidence must only have been sufficient to prove reckless indifference. We therefore focus our analysis on the reckless indifference issue.

(2)  That the decision maker was a principal or served the
      employer in a managerial capacity;

(3)  That the decision maker acted within the scope of his
      employment in making the challenged decision; and

(4)  That the employer failed to engage in good-faith
      efforts to comply with the law.

*See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443-45 (4th Cir.
2000). In this appeal, FedEx does not contest the punitive damages
award on the basis of a lack of proof on either the second or third of
the *Lowery* factors. That is, it acknowledges that Lockhart's supervi-
sors served FedEx in a managerial capacity, and that in dealing with
Lockhart's ADA accommodation issues they acted within the scope
of their employment with FedEx. Rather, FedEx maintains that the
evidence failed to prove the first and fourth of the *Lowery* factors —
first, that Lockhart's supervisors failed to reasonably accommodate
Lockhart in the face of a perceived risk that such failure violated the
ADA; and, second, that FedEx failed to engage in good-faith efforts
to comply with the ADA.[10] We address these two evidentiary argu-
ments in turn.

1.

On the first of the contested *Lowery* issues, FedEx maintains that
the punitive damages award should have been vacated by the district
court because, on the evidence, the jury was not entitled to find that
Cofield or Hanratty (or others) acted with reckless indifference in fail-
ing to provide reasonable ADA accommodations for Lockhart's deaf-
ness. More specifically, FedEx contends that Cofield and Hanratty
"knew that accommodations were required," and that they "believed
they were making sufficient accommodations" for Lockhart. Appel-
lant's Br. 23. A showing of reckless indifference required proof that

---

[10]Although the jury was not instructed in the precise language of the
*Lowery* factors, the instructions, viewed as a whole, sufficiently apprised
the jury of the applicable legal principles on the *Lowery* issues being pur-
sued on appeal. In any event, the propriety of the instructions was not
objected to and is not challenged on appeal.

a FedEx managerial official failed to accommodate Lockhart in the face of a perceived risk that such a failure would violate the ADA. *See Kolstad*, 527 U.S. at 536. Significantly, we have heretofore found evidence sufficient to support a jury finding of a perceived risk in cases where the employer's managerial agent had "at least a rudimentary knowledge" of the import of a federal anti-discrimination statute. *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002) (concluding jury entitled to find that supervisor who saw EEOC poster warning against sexual harassment perceived risk of violating Title VII); *see also Lowery*, 206 F.3d at 443 (determining evidence sufficient to prove that supervisors perceived risk of contravening Title VII by refusing to promote African-American employees, in that employer provided training on such legal obligations); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir. 1999) (recognizing that, because Wal-Mart manager was familiar with ADA, jury could conclude that Wal-Mart perceived risk of violating ADA by failing to accommodate employee and then transferring and discharging him).

Here, the instructions (to which FedEx did not object) did not specify who — for example, Hanratty, Cofield, Thompson, or someone else — could be considered as a relevant FedEx managerial official. Therefore, if the jury could have found that any one of them perceived the risk that their failure to accommodate Lockhart would violate the ADA, we are not entitled to vacate the punitive damages award for lack of sufficient evidence to support the first *Lowery* finding.

On this evidence, the jury was entitled to find, by way of example, that Hanratty, as an undisputed managerial official, failed to accommodate Lockhart in the face of a perceived risk of violating the ADA. Such a finding could be made on the basis of the following:

- Hanratty was specifically aware of FedEx's internal ADA compliance policy, and had received training from FedEx on the ADA's compliance requirements;

- Hanratty was responsible for all personnel matters at the FedEx-BWI Ramp, and he directly supervised Thompson and Cofield;

• Hanratty was aware — during Lockhart's entire employment period — of Lockhart's deafness disability. Moreover, when Thompson first advised Hanratty that he had hired a deaf employee, Hanratty responded by asking "why" Thompson had done so;

• Under Hanratty's supervision, Thompson and Cofield continually denied or ignored Lockhart's repeated requests for, inter alia, complete notes at daily meetings, and ASL translation (and close-captioning assistance, where appropriate) at his job interview, orientation training, and monthly meetings. As a consequence, Lockhart rarely received notes summarizing daily meetings. For two years, he was repeatedly denied ASL interpretation and closed-captioning at monthly meetings;

• Hanratty convened quarterly meetings that Lockhart was required to attend, and no ASL interpretation was ever made available to Lockhart at those meetings;

• Hanratty denied Cofield's request for training on FedEx's ADA compliance policy;

• Although Hanratty was familiar with the ADA compliance policy included in FedEx's People Manual, he never consulted the policy or encouraged Cofield to read it;

• Hanratty knew that Russell, his managerial counterpart at Dulles, was supervising deaf employees, but Hanratty never contacted Russell to find out what accommodations were being provided to those employees. Eventually, in 2002, Cofield contacted Russell and obtained O'Quinn's services; and

• Hanratty knew about Lockhart's October 2001 EEOC charge for years, but failed to inform Cofield about it. Cofield only found out about the charge from another FedEx official more than a year after it was filed.

The jury was further entitled to find that Cofield knew of his ADA obligation to provide reasonable accommodations to Lockhart for his deafness disability, and thus perceived the risk that his failure to do so would violate the ADA. For example, although Cofield did not receive any ADA training from FedEx, he had contacted other FedEx officials, including Connors in FedEx's "corporate headquarters," an unnamed official in FedEx's legal department, and Arrington (Senior Personnel Representative for the FedEx-BWI Ramp) seeking clarification on what might constitute reasonable ADA accommodations for Lockhart.

In sum, the trial evidence was sufficient for the jury to find, by a preponderance thereof, that a managerial official of FedEx perceived the risk that his failure to provide Lockhart with reasonable accommodations would contravene the ADA. Thus, the jury was entitled to find that FedEx had acted, in *Kolstad*'s terms, with "recklessness in the subjective form."

2.

On the second of the contested *Lowery* issues (pertaining to the fourth *Lowery* factor), FedEx contends that punitive damages liability could not properly be imputed to it because it made good-faith efforts to comply with the ADA. Specifically, FedEx contends that adoption of its ADA compliance policy, as set forth in the People Manual (providing that reasonable accommodations should be made for disabled employees), in conjunction with its internal grievance policy for handling employee complaints, established that it had acted in good faith to comply with the ADA. FedEx also maintains that the trial evidence failed to prove otherwise.

Unfortunately for FedEx, the mere existence of an ADA compliance policy will not alone insulate an employer from punitive damages liability. Rather, in order to avoid liability for the discriminatory acts of one of its management officials, an employer maintaining such a compliance policy must also take affirmative steps to ensure its implementation. As we recognized in our *Lowery* decision, "[w]hile an employer's institution of a written policy against . . . discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind . . . , such a policy is

not automatically a bar to the imposition of punitive damages." 206 F.3d at 446. In *Lowery*, Judge Hamilton carefully explained that a jury is not obliged to find that an employer has engaged in good-faith efforts to comply with the law if "the sincerity of [the employer's] commitment to a company-wide policy against . . . discrimination in the workplace is called into question" by other evidence. *Id.*; *see also EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d at 1248-49 (concluding that "written policy against discrimination . . . alone is not enough," where "[o]ur review of the record leaves us unconvinced that [the employer] made a good faith effort to educate its employees about the ADA's prohibitions"); *cf. Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 548-49 (4th Cir. 2003) (rejecting punitive damages liability where employer "had extensively implemented organization-wide Equal Employment Opportunity Policy," established grievance policy encouraging reporting of claims, informed employees of anti-retaliation stance, developed diversity training program, and voluntarily monitored departmental demographics to ensure diversity); *Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 254 (1st Cir. 2000) (holding that court properly declined to submit punitive damages question to jury, where record was "replete" with evidence that employer had "instituted policies prohibiting any type of discrimination, trained its personnel to ensure equal treatment of employees with disabilities, and took good faith efforts to comply with the ADA").

On the evidence, the jury was entitled to find that FedEx failed to sufficiently take affirmative steps to ensure the implementation of its ADA compliance policy with respect to Lockhart. In this case, FedEx managerial officials shared responsibility for the failed implementation of the policy with the company's managerial agents at the FedEx-BWI Ramp. For example, through Cofield, at least three higher FedEx officials received notice that a deaf package handler had requested or was in need of ADA accommodations at the FedEx-BWI Ramp. As noted, Cofield initiated contact in 2001 with an official in FedEx's legal department to clarify FedEx's ADA obligations with respect to Lockhart. In 2002, he contacted Connors at "corporate headquarters" twice, and he contacted Arrington, the Senior Personnel Representative for the FedEx-BWI Ramp, at least once, concerning the need to provide ADA accommodations for Lockhart. Furthermore, Connors — as well as Hanratty — was placed on notice of ADA

compliance problems at the FedEx-BWI Ramp when Lockhart filed his charge of discrimination with the EEOC in October 2001.

In spite of such notice, there is no evidence that any alarm bells sounded in FedEx offices. Neither Hanratty nor any other FedEx officials took steps to ensure that Cofield, as Lockhart's immediate supervisor, was adequately prepared to implement FedEx's ADA compliance policy. No one advised Cofield to consult the ADA policy statement in the People Manual, which emphasizes the mandate of the ADA and its reasonable accommodations requirement. Although Hanratty had himself received training from FedEx on ADA compliance, he denied Cofield's own request for such training. Nor did FedEx show that the steps Cofield eventually took to provide accommodations to Lockhart resulted from Cofield's reference to the People Manual or consultations with his superiors at FedEx. These omissions were significant given that, prior to Lockhart being hired, Cofield had never supervised a hearing impaired employee.

On appeal, FedEx emphasizes the existence of its internal grievance procedure, which is cross-referenced in the ADA compliance policy section of the People Manual. FedEx does not, however, assert that this grievance procedure was ever made available to Lockhart. In fact, Lockhart was not provided with FedEx's form for requesting ADA accommodations until January 2003, almost three years after he began working at the FedEx-BWI Ramp (and the same month in which he was discharged). Under the evidence, FedEx failed to relay basic information about Lockhart's EEOC charge down the chain of command. Although Hanratty knew "for years" that Lockhart had filed an EEOC charge, he failed to inform Cofield about it. J.A. 479. The jury also heard evidence that Cofield was not notified of Lockhart's EEOC charge until approximately fourteen months after it was filed, and at least six months after the EEOC issued its initial ruling thereon.

On this record, viewed in the light most favorable to the EEOC and Lockhart, there was sufficient evidence for the jury to find that FedEx failed to engage in good-faith efforts to implement its ADA compliance policy, and that, in the context of this case, FedEx's commitment to implementing its grievance process did not go beyond including the

procedure in the People Manual.[11] As a result, we must affirm the district court's denial of FedEx's Rule 50 motion for judgment as a matter of law on the punitive damages award.

B.

Alternatively, FedEx challenges on appeal the district court's denial of its motion for a remittitur on the $100,000 punitive damages award. FedEx maintains that the award was unconstitutionally excessive and should be reduced because (1) there was insufficient evidence to show that Lockhart's supervisors had acted reprehensibly; (2) the award was unconstitutionally out of proportion to the $8,000 compensatory damages award; and (3) the court erred in upholding the award solely on the basis that it was below the statutory damages cap.

A punitive damages award is subject to review for compliance with the procedural and substantive constitutional limitations of the Due Process Clause of the Fifth Amendment, lest a grossly excessive award of such damages effect an arbitrary deprivation of property. *See Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993) (recognizing that Fourteenth Amendment due process principles apply to punitive damages issues pursued under Fifth Amendment); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will

---

[11]As noted earlier, the court's instructions on the good-faith issue emphasized that a "party that . . . delays the interactive process is not acting in good faith," and that a "party who fails to communicate, by way of initiation or response, may also be acting in bad faith." J.A. 573. On the evidence, the jury could readily conclude that the interactive process between Lockhart and FedEx on his ADA accommodations issues was continually obstructed and delayed by the inaction and dilatoriness of Cofield, Hanratty, and others at FedEx. As a result, it was entitled to find that FedEx was not acting in good faith. Furthermore, the continuing failure of Cofield and Hanratty to reasonably communicate with Lockhart on his accommodation requests — by way of both initiation and response — sufficiently support a jury finding, under the instructions, that FedEx was acting in bad faith.

subject him to punishment, but also of the severity of the penalty that a State may impose."). If a punitive damages award is unconstitutionally excessive, it is our obligation to order a remittitur or award a new trial. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

In assessing the constitutionality of a punitive damages award, we are obliged to adhere to three "guideposts" identified by the Supreme Court: (1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties that are authorized or imposed in comparable cases. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

1.

FedEx first maintains that the punitive damages award lacks sufficient evidentiary support on the reprehensibility issue, that is, that the requisite degree of reprehensibility was not established. Reprehensibility is the first and most important of the three *BMW* guideposts. We are obliged to assess a reprehensibility issue on the basis of five factors: (1) whether the harm done was physical as opposed to economic; (2) whether the conduct involved indifference to the health or safety of others; (3) whether the victim was financially vulnerable; (4) whether the conduct involved repeated actions or was isolated; and (5) whether the harm suffered by the plaintiff resulted from conduct that was known or suspected to be unlawful. *BMW*, 517 U.S. at 576-77.

Viewed in the light most favorable to the EEOC, there was evidence of at least three of these factors (the second, fourth, and fifth), sufficient to show that FedEx's conduct could be deemed reprehensible by a jury. For example, FedEx's continuing failure and refusal to provide ADA accommodations for Lockhart's deafness disability did not result from isolated incidents. Lockhart's deafness was always known by his supervisors at the FedEx-BWI Ramp, and his disability never changed. From the time of his request for ASL assistance at his initial job interview with Thompson in early 2000, Lockhart made

repeated and unsuccessful requests to FedEx for ASL translation assistance and other accommodations.

Although Lockhart suffered no physical harm from the actions complained of, his supervisors at FedEx were plainly indifferent to the fact that their failure to accommodate his disability could jeopardize his safety, and potentially implicate the safety of others. Because Lockhart was denied the ADA accommodations necessary for him to understand and participate in employee meetings and training sessions, he consistently missed updates about important subjects such as workplace safety, handling dangerous goods, interpreting hazardous labels, and potential anthrax exposure. Finally, Lockhart's supervisors were familiar with the mandate of the ADA and perceived the risk that their conduct was unlawful. Under the evidence, the jury was thus entitled to find that FedEx higher management officials, including Cofield and Hanratty, had acted reprehensibly with respect to Lockhart's need for ADA accommodations.

2.

FedEx also contends that the "mere proportion" of compensatory damages to punitive damages warrants a remittitur in this case. Appellant's Br. 35. Notwithstanding FedEx's contention, the 12.5 to 1 ratio between the compensatory and punitive damages awards does not, as a matter of law, render the punitive damages award unconstitutionally excessive. As the Supreme Court explained in *BMW*, a punitive damages award should bear some reasonable relationship to the corresponding award of compensatory damages, but such a relationship is only one factor in an excessiveness analysis. *See* 517 U.S. at 580; *see also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) ("[T]his Court [has] eschewed an approach that concentrates entirely on the relationship between actual and punitive damages."). Indeed, the Court has specifically declined to draw some mathematical bright line between constitutionally acceptable and unacceptable ratios. *See BMW*, 517 U.S. at 582-83; *see also Campbell*, 538 U.S. at 425-26 (holding that, although ratios are instructive, they are not binding measures of constitutionality); *Cooper Indus. v. Leatherman Tool Group*, 532 U.S. 424, 434-35 (2001) (observing that constitutionality of punitive damages award is not to be determined by "simple mathematical formula."); *Pacific Mut. Life Ins. Co. v.*

*Haslip*, 499 U.S. 1, 18 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."). Comparatively speaking, the 12.5 to 1 ratio between the compensatory and punitive damages awards in this case is well below the 500 to 1 disparity deemed unconstitutional by the Court in its *BMW* decision. It is also less than the 19 to 1 ratio that was upheld by the First Circuit in *Romano v. U-Haul Int'l*, 233 F.3d 655 (1st Cir. 2000).

3.

Finally, the fact that the punitive damages award, when aggregated with the compensatory damages award, was substantially below the $300,000 statutory cap on such damages, as provided for by 42 U.S.C. § 1981a, provides additional support for the reasonableness and constitutionality of the punitive damages award. The statutory cap of $300,000 provided FedEx with fair notice of the range of available civil penalties for acts of discrimination that contravened the ADA. *See Romano*, 233 F.3d at 673 ("[A] punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated."); *see also Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1245 (10th Cir. 1999) (rejecting contention that award of maximum damages allowable under § 1981a statutory cap is excessive).

FedEx contends that the district court erred on this point, however, in that it based its refusal to reduce the punitive damages award solely on the fact that the award was below the statutory cap, and thus that it was reasonable per se. *See* J.A. 654-55. Even if the court had so ruled, we would yet affirm its denial of FedEx's request for a remittitur, because the punitive damages award was plainly reasonable in light of at least three relevant factors: reprehensibility, proportionality, and the statutory cap.[12]

---

[12]In seeking relief in the district court, FedEx addressed all three of these factors (reprehensibility, proportionality, and statutory cap). Although the district court specified the importance of the award being less than the statutory cap, that specification does not necessarily indicate that it ignored FedEx's other assertions on reprehensibility and proportionality. In any event, we have carefully considered — and rejected — each of these contentions.

As a result, we reject FedEx's contention that the punitive damages award is unconstitutionally excessive. In the circumstances, there is no basis for us to order a remittitur of the punitive damages award, and FedEx's alternative request for such relief must be denied.

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*