Unpublished opinions are not binding precedent in this circuit.
DUNCAN, Circuit Judge:
Worldwide Network Services, Inc. (‘WWNS”) sued DynCorp International, LLC (“DynCorp”) for discrimination under 42 U.S.C. § 1981 and various torts after DynCorp terminated a subcontract with WWNS related to government work in Iraq and Afghanistan. Upon finding Dyn-Corp liable, a jury awarded WWNS $10 million in punitive damages. On appeal, DynCorp challenges three evidentiary rulings, two jury instructions, and the district court’s denial of DynCorp’s motions under Federal Rule of Civil Procedure 50. For the reasons stated below, we affirm in part and reverse in part, vacating the award of punitive damages.
I.
A.
DynCorp contracted with the United States Department of State to provide services in Iraq and Afghanistan for the Worldwide Personal Protective Services program (“WPPS”) and Civilian Police program (“CivPol”). WPPS protects United States personnel and certain foreign officials abroad. CivPol provides law enforcement, criminal justice, and other assistance to societies undergoing post-conflict reconstruction. DynCorp carried out the services through its International Technical Services Division (“ITS Division”). The CivPol Program Manager was Richard Cashon.
In February 2004 DynCorp entered into subcontracts with WWNS to provide communication and information-technology services for WPPS and CivPol (“WPPS Subcontract” and “CivPol Subcontract”). DynCorp then issued task orders that would expire between August and October 2006.[1] WWNS had been designated a Small Disadvantaged Business by the United States Small Business Administration under the Small Business Act of 1953 § 8(a), 15 U.S.C. § 637(a), because its owners Walter Gray and Reginald Bailey are African American. WWNS was awarded the WPPS and CivPol Subcontracts after well-known entrepreneur Ross Perot introduced Gray and Bailey to Steven Cannon, who was then President and CEO of DynCorp.
*436 B.
The quality of WWNS’s work remains unclear. In January 2006 the State Department twice complained about WWNS and threatened to terminate DynCorp as a result. One complaint stated, “WWNS’s technical performance has in general been inadequate to the point where it has disrupted critical communications in the field.” J.A. 117. Also, DynCorp had previously complained to WWNS about radio failures. Notwithstanding, Cashon gave WWNS glowing evaluations in January and March 2006. His March evaluation deemed WWNS “excellent” or “good” in every category and stated that DynCorp would hire WWNS again.
After receiving the State Department complaints, DynCorp investigated WWNS’s work and generated two internal reports. First, the CivPol Iraq IT Evaluation (“Iraq Report”) completed by June 19, 2006, evaluated WWNS’s work at the Baghdad Hotel, the CivPol headquarters for Iraq. Second, the Middle East Information Technology Tiger Team Site Assessment Report (“Tiger Report”) dated July 22, 2006, evaluated WWNS’s work at locations in Afghanistan. The reports’ principal author was Christopher Kellogg (“Kellogg”), but other DynCorp employees also contributed. Each report was highly critical of WWNS.
C.
DynCorp’s relationship with WWNS began to deteriorate in December 2005 when DynCorp hired new executives in the ITS Division. Robert Rosenkranz became President, Richard Walsh became Vice-President of Operations, Walter Merrick became Deputy CivPol Program Manager, and Leon DeBeer became Information-Technology Manager. With these arrivals, DynCorp began excluding WWNS personnel from planning meetings, ignoring emails from WWNS managers in Iraq, and failing to provide WWNS employees with needed access to worksites and equipment. In particular, DynCorp failed to provide WWNS employees with security badges needed to move around in Iraq.
The tension between DynCorp and WWNS reached breaking point in summer 2006. On July 17, 2006, Cannon resigned as President and CEO of DynCorp. Immediately thereafter, DynCorp decided not to issue further task orders under the CivPol Subcontract or to renew the subcontract. DynCorp alleges that Cashon was solely responsible for this decision. Cashon’s testimony and other evidence, however, indicate that Cashon, Rosen-kranz, Merrick, and Walsh made the decision collectively.
Prior to the CivPol Subcontract’s expiration, DynCorp engaged in certain questionable behavior toward WWNS. For example, DynCorp had Charles Jones, WWNS’s Iraq Country Manager, escorted from his workplace at gunpoint. DynCorp then recruited WWNS’s non-managerial employees in Iraq and Afghanistan to join DynCorp or EDO Corporation (“EDO Corp”), the non-minority-owned company that would eventually replace WWNS. Moreover, Walsh directed DynCorp’s accounting department to stop processing or paying invoices from WWNS for work already completed.[2] In stopping payment, DynCorp did not provide WWNS with notice or the opportunity to cure alleged deficiencies in the work. Because almost all of WWNS’s business came from Dyn-Corp, DynCorp’s actions in ending the CivPol Subcontract, recruiting WWNS’s employees, and stopping payment on its invoices nearly destroyed WWNS.
*437 D.
Beyond the above questionable behavior, the record contains evidence of Dyn-Corp’s racial animus toward 'WWNS. John Mack, a consultant for DynCorp, testified that Walsh called Gray “a stupid black mother....” J.A. 1723. Also, Rosenkranz terminated DynCorp’s only minority executive Richard Spencer, a Latino, who testified to “some underlying discriminatory things” behind his termination. J.A. 1019.
DeBeer in particular expressed racial animus, often calling Gray “nigger” and “kaffir.”[3] J.A. 872. According to Jones, DeBeer expressed “[t]wo to three times a week” that “people of Anglo descent ... had made a grave error” because they “had taken the black man as a youth and attempted to clothe him and send him to school” and that “the proper role of the black man was to go out and kill a lion, proving his manhood, at which point in time he should be put to work to feed his family ... and mated with a woman so that he would have more children, who could then be put to work feeding their family.” J.A. 874. Jones said DeBeer predicted that DynCorp’s relationship with WWNS would end and explained that “that ending , was being manufactured by ... factions within DynCorp” that opposed Cannon. J.A. 869. Jones noted that De-Beer was “consumed by ... hatred” for “Cannon and everybody associated with him.” J.A.873.
Finally, DynCorp celebrated WWNS’s demise during a company dinner in October 2006 hosted by Rosenkranz. At the dinner, Walsh received a T-shirt that read, “WWNS — I took them down, and all I got was this lousy T-Shirt.” J.A. 1139. After Walsh put on the T-shirt, DynCorp employee Bill Cavanaugh presented a letter purportedly from Gray to Walsh and read it aloud in mock Ebonics. According to a DynCorp executive, Rosenkranz “was laughing his ass off.” J.A. 1029.
E.
In October 2006 WWNS brought this action against DynCorp and EDO Corp in the District of Columbia. The case was later transferred to the Eastern District of Virginia. The complaint asserted claims of discrimination under 42 U.S.C. § 1981 (Count 1); tortious interference with contract (Count 3); tortious interference with prospective economic advantage (Count 4); civil conspiracy (Count 5); conspiracy under the Virginia Conspiracy Act, Va.Code Ann. § 18.2-499 (Count 6); breach of the CivPol Subcontract (Count 7); breach of the WPPS Subcontract (Count 8); and breach of the implied covenant of good faith and fair dealing (Count 9).[4] In turn, DynCorp filed counterclaims of breach of the CivPol Subcontract, breach of the WPPS Subcontract, and breach of warranty. WWNS and DynCorp proceeded to trial by jury in May 2008. WWNS and EDO Corp settled on the eve of trial.
Before trial, DynCorp planned to introduce the Iraq and Tiger Reports into evidence through Kellogg, who would testify about his observations during DynCorp’s internal investigation. However, the district court granted WWNS’s motion to exclude the testimony, saying the reports contained hearsay. The court also found the reports and Kellogg’s proposed testimony inadmissible under Federal Rule of Evidence 701, which prohibits lay witnesses from giving expert testimony.
During trial, DynCorp objected to Spencer’s testimony about his termination *438 by Rosenkranz based on Federal Rules of Evidence 401 and 403.[5] The district court overruled this objection, reasoning that Spencer’s testimony was “relevant to the issue of pretext as it demonstrates Dyn-Corp’s corporate attitude toward minorities and provides insight into what factors contributed to DynCorp’s decision to terminate its relationship with WWNS.” J.A. 1891. Later, DynCorp tried to offer rehabilitative testimony from Jasbir Gill, a Sikh employee at DynCorp. The court held, ‘Well, I’ll allow Ms. Gill to testify about her interaction with Mr. DeBeer, and whether or not he used any racial slurs in her presence,” but “[h]ow she was treated by the company is irrelevant.” J.A. 1568.
Finally, DynCorp objected to the testimony of John Mack. When WWNS called him on rebuttal, Mack testified that Walsh called Gray “a stupid black mother....” J.A. 1723. About ten questions later, Dyn-Corp objected and moved to strike because WWNS had failed to notify DynCorp about Mack’s testimony under Federal Rule of Civil Procedure 26(e), which requires parties to supplement discovery when new evidence surfaces. During a bench conference, WWNS admitted its failure to notify DynCorp pursuant to Rule 26(e). Nonetheless, the court denied Dyn-Corp’s motion to strike and instead instructed the jury to take into consideration WWNS’s failure to notify DynCorp about Mack’s testimony.
Following the close of evidence, the district court granted WWNS’s motion under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law regarding unpaid invoices totaling almost $2.8 million. The court then instructed the jury.
Regarding the § 1981 discrimination claim, DynCorp had requested an instruction based on Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir.2004). The proposed instruction stated:
DynCorp asserts that the person who made the decision not to renew or extend the WWNS CIVPOL subcontract or task orders was not improperly motivated by discrimination. To the extent that WWNS rests its discrimination claim upon the discriminatory motivations of a subordinate employee, WWNS must show by the greater weight of the evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for DynCorp.
J.A. 1185. The district court refused to give this instruction, explaining: “I don’t think I need to. I think you can prove that they [DynCorp] were responsible or not, and the jury doesn’t have to specify which person did what.” J.A. 1656. Instead, the court instructed: “WWNS must prove that DynCorp intentionally discriminated against WWNS. That is, the race of WWNS’s owners must be proven to have been a motivating factor in DynCorp’s decision not to renew WWNS’s CIVPOL subcontract or issue further task orders thereunder.” J.A. 1762.
Regarding punitive damages, the district court gave the following instruction:
[Y]ou may award punitive damages if WWNS ... [has] shown by clear and convincing evidence that DynCorp maliciously, or with reckless indifference, *439 discriminated against WWNS, and/or that DynCorp tortiously interfered with the contracts between [WWNS] and its employees, and/or conspired with EDO to interfere with the contracts between [WWNS] and its employees, and/or that DynCorp tortiously interfered with WWNS’s prospective economic advantage.
J.A. 1771. By contrast, DynCorp had requested an instruction that began, “WWNS claims the acts of DynCorp were done with malice or reckless indifference to WWNS’s federally protected rights.” J.A. 1186 (emphasis added).
After several days of deliberation, the jury returned a split verdict. It found in DynCorp’s favor on Counts 4-6 and one of DynCorp’s counterclaims, awarding Dyn-Corp $178,000 for breach of the WPPS Subcontract. The jury found in WWNS’s favor on all other claims. It awarded WWNS compensatory damages of $8.42 million for Count 1 (§ 1981 discrimination), $83,000 for Count 3 (tortious interference with contract), $558,510.42 for Count 7 (breach of CivPol Subcontract), $42,092.62 for Count 8 (breach of WPPS Subcontract), and $720,000 for Count 9 (breach of implied covenant of good faith and fair dealing). The jury also awarded WWNS $10 million in punitive damages.
The district court denied DynCorp’s renewed Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law, Rule 59(a) motion for a new trial, and Rule 59(e) motion to alter or amend the judgment. This appeal followed. We have jurisdiction under 28 U.S.C. §§ 1331 and 1291.[6]
II.
On appeal, DynCorp asserts (1) that the district court should have given DynCorp’s proposed jury instruction regarding the § 1981 discrimination claim; (2) that Dyn-Corp should have been awarded judgment as a matter of law on that claim; (3) that Kellogg’s testimony and the Iraq and Tiger Reports should have been admitted; (4) that Spencer’s testimony should have been excluded; (5) that Mack’s testimony should have been struck; (6) that the jury instruction on punitive damages for § 1981 discrimination was erroneous; and (7) that the record does not support punitive damages for § 1981 discrimination.[7] We consider each contention below.
A.
We first consider DynCorp’s challenge to the district court’s failure to give its proposed jury instruction regarding the § 1981 discrimination claim. “A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court’s charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant’s ability to conduct his defense.” United States v. Passaro, 577 F.3d 207, 221 (4th Cir.2009) (internal quotations omitted). “We review the district court’s decision to give or refuse to give a jury instruction for abuse of discretion.” Id. “Moreover, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire *440 charge, the instructions accurately and fairly state the controlling law.” Id. (internal quotations omitted).
Because DynCorp’s proposed instruction regarding the § 1981 claim was based on Hill, in reviewing the district court’s failure to give that instruction we must consider Hill’s applicability to this case. Ethel Hill was a Lockheed mechanic who repaired aircraft at military bases under contracts between Lockheed and the United States. Her work was overseen by a “lead person” who reported to her supervisor. Lockheed also assigned a safety inspector to each jobsite who reported to the lead person but lacked supervisory authority. Hill received three written reprimands based on errors discovered by her jobsite’s safety inspector and was terminated pursuant to company policy. Hill alleged discrimination by that inspector, who had often called her a “damn woman” and “useless old lady” who should retire. Hill, 354 F.3d at 283.
Hill sued Lockheed under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e (“Title VII”), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (“ADEA”), arguing that but for the inspector’s discrimination she would have received fewer reprimands and avoided termination. The district court granted summary judgment to Lockheed on the ground that the inspector’s bias could not be imputed to Lockheed. Hill, 354 F.3d at 283. In affirming, we announced this rule:
[T]o survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.
Id. at 291 (emphasis added). Accordingly, we found summary judgment appropriate because Hill had not shown evidence that the safety inspector could be considered the actual decisionmaker or the one principally responsible for the decision to terminate Hill. Id. at 297-98.
DynCorp argues that the Hill rule governs the case now before us. After carefully studying Hill, we disagree. In that case, the ultimate question was whether Lockheed intentionally discriminated in deciding to terminate Hill. This required evidence that her “ ‘protected trait ... actually motivated the employer’s decision,’ ” that is, that the trait “ ‘actually played a role in the employer’s decision-making process and had a determinative influence on the outcome.’” Id. at 286 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Accordingly, we considered “who is a ‘decisionmaker’ for purposes of discrimination actions brought under Title VII and the ADEA.” Hill, 354 F.3d at 286. We said agency principles guided our decision because both statutes defined “employer” to include “any agent” thereof. Id. at 287; see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). We then noted El-lerth, where the Supreme Court explained that “[t]he supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control,” and that “tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.” Id. at 762, 118 S.Ct. 2257. Therefore, the Court said that “a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.” Id.
*441 The case most important to our Hill decision was Reeves. Roger Reeves supervised assembly-line workers for Sand-erson Plumbing Products, Inc., which made toilet seats and covers. Upon learning that Reeves made various mistakes, Powe Chestnut, the director of manufacturing and the husband of company president Sandra Sanderson, told Sanderson that Reeves should be fired. Sanderson followed his recommendation. Reeves then sued under the ADEA, alleging that his termination resulted from discrimination by Chestnut, who had often showed discriminatory animus toward him. Reeves, 530 U.S. at 138, 120 S.Ct. 2097. The Supreme Court found that Reeves had overcome judgment notwithstanding the verdict because, although Sanderson “made the formal decision to discharge” Reeves, Chestnut “was principally responsible for” and “the actual decisionmaker behind his firing.” Id. at 151-52, 120 S.Ct. 2097. Reeves had produced evidence that Chestnut “exercised ‘absolute power’ within the company.” Id. at 152, 120 S.Ct. 2097.
Ultimately, Reeves’s rationale dictated the rule that Hill announced. See Hill, 354 F.3d at 288-89 (“Reeves informs us that the person allegedly acting pursuant to a discriminatory animus need not be the ‘formal decisionmaker’ to impose liability upon an employer for an adverse employment action, so long as ... the subordinate was the one ‘principally responsible’ for, or the ‘actual decisionmaker’ behind, the action.” (quoting Reeves, 530 U.S. at 151-52, 120 S.Ct. 2097)). For our purposes, Reeves also clarifies the Hill rule. Reeves distinguishes between the “formal deci-sionmaker,” which under Ellerth would be the person authorized to make the relevant decision, and “subordinate” employees who lack this authority, such as Chestnut or the safety inspector in Hill. Accordingly, we believe the term “subordinate employee” in the Hill rule invokes that distinction. Hill, 354 F.3d at 291.
Using this interpretation, and assuming for purposes of this appeal that Hill applies under § 1981, we conclude that Dyn-Corp can take no comfort from Hill on the facts before us. DynCorp relies on Hill to argue that, because it alleges that Cashon was solely responsible for the decision to terminate the CivPol Subcontract, the jury should not have been allowed to consider the racial animus of anyone other than Cashon. We note, however, that Hill does not enable DynCorp to self-select the deci-sionmaker whose motives are the purest. Furthermore, we find Hill inapplicable for two separate reasons.
First, the Hill rule’s initial premise, namely, that the plaintiff “rests a discrimination claim ... upon the discriminatory motivations of a subordinate employee,” assumes that a formal decisionmaker can be identified. Id. at 291. In this case, however, WWNS and DynCorp offered conflicting evidence regarding who had authority to terminate the CivPol Subcontract. Cashon testified to having this authority but also admitted that he answered to Rosenkranz regarding his decision. Moreover, other evidence indicated that Cashon, Merrick, Rosenkranz, and Walsh were authorized to make that decision collectively. Significantly, Walsh was the one who directed DynCorp’s accounting department to stop payment to WWNS for completed work. By contrast, this problem of identification was absent from Hill and Reeves, where none debated who had formal decisionmaking authority.
Second, even assuming that only Cashon could be considered the formal decision-maker, we are unwilling to conclude that Walsh and Rosenkranz, who supervised Cashon, should be treated like the Hill and Reeves subordinate employees who lacked authority over the formal decision- *442 maker. Because Hill thus does not apply to this case, we conclude that the district court’s refusal to give DynCorp’s proposed instruction was not an abuse of discretion.[8]
B.
Next, we consider DynCorp’s challenge to the district court’s denial of DynCorp’s renewed Rule 50(b) motion for judgment as a matter of law on the § 1981 claim. “We review de novo the grant or denial of a motion for judgment as a matter of law.” Robinson v. Equifax Info. Sens., LLC, 560 F.3d 235, 240 (4th Cir. 2009) (internal quotations omitted). “Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.” U.S. ex rel. DRC, Inc. v. Custer Battles, LLC, 562 F.3d 295, 305 (4th Cir. 2009) (internal quotations omitted); see also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 147 (4th Cir.2008) (“A court may award judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.”). On this issue, we must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party’s favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir.2002).
In this case, § 1981 liability required proof that race actually motivated Dyn-Corp’s decision to terminate the CivPol Subcontract, that is, that race “actually played a role in the ... decisionmaking process and had a determinative influence on the outcome.” Reeves, 530 U.S. at 141, 120 S.Ct. 2097. DynCorp alleges that only Cashon made the decision to terminate the CivPol Subcontract. Accordingly, Dyn-Corp concludes that all other DynCorp executives’ alleged racial animus must be ignored under Hill. In that light, DynCorp asserts that the verdict cannot stand. We disagree with the initial premise that only Cashon made the decision.[9] The record contains sufficient evidence from which a reasonable jury could conclude that Ca-shon, Rosenkranz, Merrick, and Walsh made a collective decision to terminate the CivPol Subcontract. The record also contains evidence that Rosenkranz and Walsh harbored racial animus against Gray and Bailey. This evidence includes Walsh’s racial slur, Spencer’s termination by Rosen-kranz, Walsh stopping payments to WWNS, and the checkered October 2006 dinner celebrating WWNS’s misfortune.[10] *443 Therefore, sufficient evidence of discrimination was presented for § 1981 liability.
Moreover, we note that WWNS presented adequate evidence to establish § 1981 liability through the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. See Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (extending McDonnell Douglas to § 1981 cases), superseded on other grounds by statute, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071. Under this analysis, the plaintiff carries an initial burden to establish a prima facie case of discrimination. A company alleg ing discriminatory contract termination may carry this burden by showing that (1) the defendant terminated a contract with it, (2) it was -within a protected class, (3) its performance under the contract met the defendant’s legitimate expectations, and (4) the defendant instead contracted with a company not in a protected class. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir.2007). Once the prima facie case has been established, the burden shifts to the defendant “to articulate a legitimate, nondiscriminatory reason” for the contract termination. Id. (internal quotations omitted). Once the defendant carries this burden of production, the burden shifts back to the plaintiff to prove that the defendant’s stated reasons “were not its true reasons, but were a pretext for discrimination.” Id. (internal quotations omitted). At this point, “the McDonnell Douglas framework — with its presumptions and burdens — disappears] ... and the sole remaining issue [i]s discrimination vel non.” Reeves, 580 U.S. at 142-43, 120 S.Ct. 2097 (internal quotations omitted).
WWNS established a prima facie case of discrimination by showing that (1) Dyn-Corp terminated the CivPol Subcontract, (2) WWNS had been designated a Small Disadvantaged Business by the SBA because Gray and Bailey are African American, (3) Cashon’s glowing evaluations of WWNS in January and March 2006 rated WWNS “excellent” or “good” across the board and stated that DynCorp would hire WWNS again, and (4) EDO Corp. was not minority-owned. In turn, DynCorp articulated a legitimate, nondiscriminatory reason for terminating the CivPol Subcontract. Cashon testified that the reason was WWNS’s poor performance. We believe a reasonable jury could have concluded that DynCorp’s stated reason was merely a pretext for discrimination. For example, the jury might have disbelieved Cashon’s testimony about DynCorp’s stated reason because Cashon himself had given WWNS glowing evaluations. Therefore, we affirm the district court’s denial of DynCorp’s Rule 50(b) motion regarding the § 1981 claim.
C.
We next consider three evidentiary rulings that DynCorp challenges. We review each for abuse of discretion. United States v. Basham, 561 F.3d 302, 325 (4th Cir .2009).
1.
First, DynCorp argues that the district court committed reversible error by excluding Kellogg’s testimony and the Iraq and Tiger Reports. This evidence was excluded under Federal Rule of Evidence 701, which “forbids the admission of expert testimony dressed in lay witness clothing.” United States v. Perkins, 470 F.3d 150, 156 (4th Cir.2006). Kellogg’s excluded testimony and the Iraq and Tiger Reports were technical evaluations of WWNS’s performance. Discussed topics include whether WWNS’s chosen method of encrypting wireless communication provided *444 enough security. We believe such matters are well beyond the scope of permissible lay testimony under Rule 701. See Certain Underwriters at Lloyd’s, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir.2000) (noting that Rule 701 “generally does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness” (internal quotations omitted)). Therefore, we conclude that the district court’s decision to exclude that evidence was not an abuse of discretion.
2.
Second, DynCorp challenges the district court’s failure to exclude Spencer’s testimony about his termination by Rosenkranz under Federal Rules of Evidence 401 and 403. The court below reasoned that Spencer’s testimony was “relevant to the issue of pretext as it demonstrates DynCorp’s corporate attitude toward minorities and provides insight into what factors contributed to DynCorp’s decision to terminate its relationship with WWNS.” J.A. 1891. We believe that Spencer’s testimony was indeed relevant because of Rosenkranz’s apparent participation in DynCorp’s decision to terminate the CivPol Subcontract. Moreover, we believe this probative value outweighed any danger of undue prejudice. Thus, we affirm the district court’s decision to allow Spencer’s testimony.
3.
Finally, DynCorp challenges the district court’s failure to strike Mack’s testimony that Walsh called Gray “a stupid black mother____” J.A. 1723. Federal Rule of Civil Procedure 26(e) provides that a party who has made a disclosure or responded to an interrogatory “must supplement or correct its disclosure or response ... in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect.” Fed.R.Civ.P. 26(e)(1)(A). Mack’s allegation became known to WWNS several days before trial, but Dyn-Corp was not made aware of it until Mack testified at trial. WWNS thus clearly violated Rule 26(e), which it does not dispute.
Upon discovering that WWNS had not disclosed Mack’s allegation, DynCorp objected and moved to strike because of WWNS’s Rule 26(e) violation. The district court denied this motion, stating: “[T]he difficulty that I have is, you’re asking me to tell the jury to disregard the hot poker that has just been put in front of their face. I don’t think I can undo it that way.” J.A. 1730. Instead, the court instructed the jury to take into consideration WWNS’s failure to notify DynCorp about Mack’s allegation. DynCorp later moved for a new trial, arguing that Mack’s testimony should have been struck, but the court denied this motion.
Federal Rule of Civil Procedure 37(c)(1) provides: “If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless.” Fed.R.Civ.P. 37(c)(1). WWNS asserts that the Rule 26 violation was harmless but concedes that no substantial justification existed.
We have said that a court determining harmlessness under Rule 37(c)(1) should consider five factors:
(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party’s explanation for its failure to disclose the evidence.
*445 S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). Based on these factors, we believe WWNS’s Rule 26 violation was indeed harmless. Although DynCorp was surprised by Mack’s testimony, the trial continued undisturbed. Moreover, the record contains abundant evidence of racial animus aside from Mack’s testimony. This includes Spencer’s termination by Rosen-kranz, the racially charged October 2006 dinner celebrating WWNS’s misfortune, and Walsh directing DynCorp’s accounting department to stop paying WWNS for work already completed. We therefore decline to reverse on this ground.
D.
Finally, we consider alleged errors regarding the $10 million punitive-damages award. DynCorp argues that punitive damages for the § 1981 claim are unsupported by the record and that the jury instruction on that issue was erroneous.
1.
We begin by considering the district court’s denial of DynCorp’s renewed Rule 50(b) motion for judgment as a matter of law with regard to WWNS’s prayer for punitive damages for the § 1981 claim. We review this decision de novo. Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 442-43 (4th Cir.2000).
A plaintiff who prevails under § 1981 “is entitled under the common law to punitive damages ... for conduct ... exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right.” Id. at 441 (internal quotations omitted). The Supreme Court developed this standard in Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), for actions under 42 U.S.C. § 1983. Congress later adopted the standard in the Civil Rights Act of 1991, which allows punitive damages in Title VII actions where the employer discriminated “with malice or with reckless indifference to the federally protected rights of an aggrieved individual.” 42 U.S.C. § 1981a(b)(l). Interpreting this statute, the Supreme Court held that “[t]he terms ‘malice’ or ‘reckless indifference’ pertain to the employer’s knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.” Kolstad v. Am. Dental Ass’n, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Accordingly, the Court held that “an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages.” Id. at 536, 119 S.Ct. 2118. Because § 1981a was intended to mirror Smith, we have held that “any case law construing the punitive damages standard set forth in § 1981a, for example Kolstad, is equally applicable to clarify the common law punitive damages standard with respect to a § 1981 claim.” Lowery, 206 F.3d at 441. Therefore, upon reviewing § 1981 punitive damages, we have required evidence that the defendant acted “in the face of a perceived risk that [its] decision would violate federal law.” Id. at 443.
Regarding this requirement, Kolstad noted hypothetical that are particularly relevant to the case before us. The Supreme Court explained:
There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized.
*446 Kolstad, 527 U.S. at 536-87, 119 S.Ct. 2118. Accordingly, even a defendant who discriminates while intending to cause injury might escape liability for punitive damages under § 1981 if he thought his conduct was lawful. This informs our remark that punitive damages are “an extraordinary remedy” and “not every lawsuit under section 1981 calls for submission of this extraordinary remedy to a jury.” Stephens v. S. Atl. Canners, Inc., 848 F.2d 484, 489-90 (4th Cir.1988).
Soon after Kolstad, we reviewed a § 1981 punitive-damages award in Lowery. Renee Lowery and Lisa Peterson alleged that Circuit City Stores, Inc. (“Circuit City”) failed to promote them because of racial animus. Circuit City was found liable under Title VII and § 1981, and the jury awarded punitive damages of $225,000. On appeal, Circuit City asserted that the record did not support punitive damages. Notably, we found punitive damages recoverable only under § 1981 and limited our analysis accordingly. Lowery, 206 F.3d at 441.
We explained, “Kolstad teaches that we ... must first ask whether the record contains sufficient evidence for a reasonable juror to find that in intentionally refusing to promote the plaintiff ... the decision maker did so in the face of a perceived risk that her decision would violate federal law.” Id. at 443. We continued, “If the answer is no, we should vacate the portion of the judgment awarding the plaintiff punitive damages and direct entry of judgment as a matter of law in favor of Circuit City on that issue.” Id. In the end, we found that the record did contain sufficient evidence because Circuit City had presented “evidence that it required every person in management to attend a week-long training seminar that included education on the federal anti-discrimination laws.” Id. (citing E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir.1999) (finding sufficient evidence where the offending manager “testified that he was familiar with the accommodation requirements of the ADA and its prohibition against discrimination and retaliation in the workplace”)).
We considered the same legal issue in subsequent cases. Sufficient evidence was found where a supervisor who engaged in sexual harassment “testified that he had seen an EEOC poster regarding sexual harassment” at work that read, “Sexual harassment is unlawful and unacceptable in the workplace.” Anderson v. G.D.C., Inc., 281 F.3d 452, 460 (4th Cir.2002). Although the supervisor denied reading the poster, we found that “a reasonable jury could nevertheless infer that [his] awareness of the poster suggested at least a rudimentary knowledge of its import.” Id. Sufficient evidence was also found where a manager “was specifically aware of FedEx’s internal ADA compliance policy, and had received training from FedEx on the ADA’s compliance requirements.” E.E.O.C. v. Fed. Express Corp., 513 F.3d 360, 373 (4th Cir.2008).
By contrast, we declined to find sufficient evidence in Ocheltree v. Scollon Productions, Inc., 335 F.3d 325 (4th Cir.2003) (en banc). Lisa Ocheltree sued her employer Scollon Productions, Inc., under Title VII because she “was the victim of severe or pervasive sex-based harassment in her workplace.” Id. at 327. We “combed the record,” however, and found “no evidence that would allow a jury to find that Scollon Productions knew, either directly or by imputation, that it might have been acting in violation of Ocheltree’s ‘federally protected rights.’ ” Id. at 336. Thus, we upheld the verdict on liability but vacated punitive damages. Id.
The case before us presents a scenario comparable to Ocheltree. WWNS has been unable to cite any evidence that Dyn-Corp terminated the CivPol Subcontract *447 “in the face of a perceived risk that [its] decision would violate federal law.”[11] Lowery, 206 F.3d at 443. The district court likewise failed to cite such evidence, and we could find none upon combing the record.[12] Accordingly, we conclude that the award of punitive damages should be vacated.[13]
2.
Even aside from the above error, the award of punitive damages could not stand because the district court’s jury instruction on punitive damages was also erroneous. “Instructions are adequate if construed as a whole, and in light of the whole record, they adequately inform the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.” S. Atl. Ltd. P’ship of Tenn., L.P. v. Riese, 284 F.3d 518, 530 (4th Cir.2002) (internal quotations omitted). “Even if instructions are flawed, there can be no reversal unless the error seriously prejudiced the challenging party’s case.” Id. (internal quotations omitted). Because DynCorp’s objection to the district court’s instruction on punitive damages was not preserved according to Federal Rule of Civil Procedure 51(d)(1), reversal would be proper “only when we can conclude that [the] particular jury instruction must necessarily have caused the jury to act in complete ignorance of, or to have misapplied, fundamentally controlling legal principles to the inevitable prejudice of an aggrieved party.” Spell v. McDaniel, 824 F.2d 1380, 1399 (4th Cir.1987); see also Fed.R.Civ.P. 51(d)(2).
In this case, the district court gave the following instruction: “[Y]ou may award punitive damages if WWNS ... [has] shown by clear and convincing evidence that DynCorp maliciously, or with reckless indifference, discriminated against WWNS.” J.A. 1771. Notably, the court never defined “malice” or specified to what “reckless indifference” refers. The word “malice” ordinarily means: “A desire to harm others or to see others suffer; ex *448 treme ill will or spite.” American Heritage Dictionary of the English Language 1059 (4th ed.2006). Unless properly instructed, a layperson would not know that “malice” also has a technical legal meaning relating to awareness that one may be breaking the law. Cf. Perry v. McCaughtry, 308 F.3d 682, 694 (7th Cir.2002) (Posner, J., dissenting) (arguing that a layperson would not without instruction know that “cause” had the technical meaning “substantial factor in”). Nor would a layperson assume that “reckless indifference” in the instruction specifically means “reckless indifference to federally protected rights.” Accordingly, the jury could not have known that “ ‘malice’ or ‘reckless indifference’ pertain to [DynCorp’s] knowledge that it may be acting in violation of federal law,” Kolstad, 527 U.S. at 535, 119 S.Ct. 2118 or that punitive damages are improper unless DynCorp acted “in the face of a perceived risk that [its] decision would violate federal law,” Lowery, 206 F.3d at 443. Therefore, we believe the challenged instruction “caused the jury to act in complete ignorance of ... fundamentally controlling legal principles.” Spell, 824 F.2d at 1399.
Regarding whether DynCorp was prejudiced by the instruction, we note again that WWNS has not identified any evidence that DynCorp suspected that terminating the CivPol Subcontract might violate federal law, and we found no such evidence in the record. Notwithstanding, the jury awarded $10 million of punitive damages, which the district court concluded was “for DynCorp’s Section 1981 violation.” J.A.1911. Therefore, we believe serious prejudice necessarily resulted from the challenged instruction.
3.
Although the punitive-damages award based on the § 1981 claim should be vacated, the jury’s verdict complicates our disposition. The district court instructed that punitive damages may be awarded on Counts 1 and 3-5. Among this group, DynCorp was found liable only on Count 1 (§ 1981 discrimination) and Count 3 (tor-tious interference with contract). The jury awarded $10 million of punitive damages, but the verdict does not specify how much was allocable to Count 1 rather than Count 3. For this reason, we cannot vacate the award without unwittingly vacating any punitive damages allocable to Count 3. Accordingly, the case must be remanded for retrial on punitive damages for Count 3.[14]
III.
For the reasons stated above, we affirm the district court’s refusal to give Dyn-Corp’s proposed jury instruction pertaining to Hill, the court’s denial of DynCorp’s Rule 50(b) motion regarding the § 1981 claim, and all evidentiary rulings challenged by DynCorp. However, we reverse the court’s denial of DynCorp’s Rule 50(b) motion regarding WWNS’s prayer for punitive damages based on the § 1981 claim, vacate the award of punitive damages, and remand the case for retrial on punitive damages for Count 3. Accordingly, we

. Regarding "task orders," see 48 C.F.R. § 16.501-1 ("Task order contract means a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract.”).

. In February 2008 DynCorp paid WWNS over $3.3 million for outstanding invoices that dated back two years. It offered no explanation for the delay.

. The term "kaffir" is "[u]sed especially in southern Africa as a disparaging term for a Black person.” American Heritage Dictionary of the English Language 952 (4th ed.2006).

. Count 2 was dismissed before trial.

. Rule 401 defines "relevant evidence” to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable.” Fed. R.Evid. 401. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Fed. R.Evid. 403.

. WWNS filed a cross-appeal, arguing that Alexis Maniatis’s proposed testimony calculating WWNS’s lost profits was erroneously excluded. Because we do not remand for another trial to determine compensatory damages, we do not reach WWNS’s cross-appeal.

. DynCorp also asserts that the award of punitive damages violates the Due Process Clause, but we do not reach this issue because we vacate that award.

.We note as well that DynCoip's proposed jury instruction was "substantially covered by the court’s charge to the jury.” Passaro, 577 F.3d at 221. As mentioned, the district court instructed that "the race of WWNS’s owners must be proven to have been a motivating factor in DynCorp’s decision not to renew WWNS’s CIVPOL subcontract or issue further task orders thereunder.” J.A. 1762. Following this instruction's clear import, the jury could not have considered evidence of racial bias regarding DynCorp employees that neither made nor had authority to make that decision. Thus, DynCorp’s proposed instruction differed from the actual one only by wrongly insinuating that just one person could have made or been responsible for the decision to terminate the CivPol Subcontract.

. We do not dispute the characterization in Judge Niemeyer’s opinion, dissenting in part, that Cashon had authority to terminate the CivPol Subcontract. However, that opinion fails to reckon with Cashon’s own testimony that he made the decision collectively with Merrick, Rosenkranz, and Walsh — the discriminatory animus of at least Rosenkranz and Walsh having been set out.

. To the extent that Judge Niemeyer’s opinion argues that, but for evidence about De-Beer, the record contained insufficient evidence to establish § 1981 discrimination, we note that that opinion fails to account for Walsh’s otherwise unexplained decision to stop payments to WWNS.

. WWNS cites only 41 C.F.R. § 60-1.4, which requires government contractors to adopt contractual language that pertains to discrimination against employees or applicants for employment under Title VII. However, the language nowhere mentions discrimination against minority-owned corporate subcontractors under § 1981.

. Judge Jones’s opinion, dissenting in part, states that WWNS’s July 26, 2006, letter to DynCoip indicates that DynCorp was warned about WWNS's federal right under § 1981. The letter itself, however, shows that this warning came after DynCoip had already terminated the CivPol Subcontract. The letter demands that DynCorp "comply with its obligations under the terms of the February 16, 2004, Subcontract and related Task Orders (collectively ‘the Agreements'),” but makes clear that DynCorp had already repudiated them. The letter states that "DynCorp has taken it upon itself to inform ... WWNS employees ... that the Agreements have been terminated,” and that WWNS ”consider[ed] DynCorp's conduct to constitute ... a material breach of the Agreements.” J.A. 2692. Because WWNS sent the letter after DynCorp had already terminated the CivPol Subcontract, the letter tells nothing about whether DynCoip previously acted "in the face of a perceived risk that [its] decision would violate federal law.” Lowery, 206 F.3d at 443.

.Added to our rationale, DynCoip argues that the legal theory WWNS advanced was "novel or otherwise poorly recognized,” Kolstad, 527 U.S. at 537, 119 S.Ct. 2118 because whether a corporation may sue under § 1981 was never crystal clear. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 473 n. 1, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006) (noting that "we have no occasion to determine whether, as a corporation, it could have brought suit under § 1981” (emphasis omitted)); Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that "a coiporation ... has no racial identity and cannot be the direct target of ... discrimination”).

. Any reconsideration should take into account the standard for awarding punitive damages under Virginia law.